1  PHILIP C. TENCER (173818)
2  S. IVETTE KUYATEH (303703)
   TENCERSHERMAN LLP
3  12520 High Bluff Drive, Suite 240
4  San Diego, CA  92130
   Telephone:  (858) 804-6900;
5  Facsimile:(858) 754-1260
6  Phil@TencerSherman.com
   Ivette@TencerSherman.com
7
8  Attorney for Plaintiffs

9           UNITED STATES DISTRICT COURT

10          SOUTHERN DISTRICT OF CALIFORNIA

11

12  CARL MELCHER and MELCHER       Case No. 16-cv-2440-BAS(BGS)
    FAMILY LIMITED PARTNERSHIP
13

14                                 **MEMORANDUM OF POINTS AND**
                                   **AUTHORITIES BY CARL MELCHER**
15                   Plaintiffs,   **and MELCHER FAMILY LIMITED**
                                   **PARTNERSHIP IN OPPOSITION TO**
16      vs.                        **LANCE FRIED'S MOTION FOR**
                                   **SUMMARY JUDGMENT**
17  LANCE FRIED
18                                 **Date:     October 29, 2018**
                     Defendants.
19                                 **Time:     No oral argument unless**
20                                 **           requested by the Court**
21
22                                 **Before: Hon. Cynthia Bashart**
23                                 **Trial Date: March 26, 2019**
24
25
26
27
28

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION.................................................................................1

II.   STATEMENT OF RELEVANT FACTS ...........................................1

III.  STANDARD FOR REVIEW FOR SUMMARY JUDGMENT .................6

IV.   ARGUMENT ......................................................................................7

   A.   The Release is Voidable Because it was Procured by Securities Fraud....7

      1.  The Litigation Exception Does Not Apply Here. ..................................10

      2.  A Release Procured by Fraud is Not Binding in California. ..............13

   B.   Fried had a Duty to Disclose.................................................................14

      1.  Fried was a Fiduciary to MFLP. ..........................................................15

         a.  The August 15, 2013 Email Offer and Acceptance was Not a
            Contract ................................................................................15

         b.  Fried was Told Not to Contact Melcher .........................................17

         c.  Fried Had No Legal Duty to Speak. ................................................17

         d.  Repurchase was by Face It, not Fried...........................................17

         e.  The Acquisition Discussions were Too Preliminary to Give Rise
            to a Duty to Disclose.................................................................17

      2.  Fried's Failure to Abstain or Disclose Material Information was a
         Breach of His Fiduciary Duty. ..........................................................20

   C.   Triable Issues of Fact Exist as to Whether Fried Wrongfully Deprived
      Melcher of His Personal Property.........................................................22

V.    CONCLUSION .................................................................................23

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

### <u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...........................................6, 7

4

*Barlow v. Ground*, 943 F.2d 1132, 1134-36 (9th Cir. 1991)....................................6

5

*Basic Inc. v. Levinson,* 485 U.S. 224 (1988) ........................................................9, 18

*Berckeley Inv. Group, Ltd v. Colkitt*, 455 F.3d 195 (3d Cir. 2006)...........................8

6

*Burgess v. Premier Corp.*, 727 F.2d 826 (9th Cir. 1984) .........................................10

7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)......................................................6, 7

*Chiarella v. United States* 445 U.S. 222 (1980)...................................................8, 18

8

*Dirks v. SEC*, 463 U.S. 646 (1983).............................................................................8

9

*Dungan v. Colt Industries, Inc.*, 532 F. Supp. 8327, (N.D. ILL, 1982) ..................20

*Facebook, Inc. v. Pac. Northwest Software, Inc.,* 640 F.3d 1034

10

   (9th Cir. 2011) ......................................................................................7, 8, 11

11

*Gonzalez v. Torres*, 915 F. Supp. 511(D.P.R. 1996) ................................................6

*Guarino v. Interactive Objects, Inc.,*122 Wn. App. 95

12

   (Wash. Ct. App., 2004) ................................................................................20, 21

13

*In Jensen v. Dain Bosworth*, *Inc.*, No. 90-35797, 1991 U.S. App.

   LEXIS 31307, (9th Cir. 2010).........................................................................10

14

*In re MRV Communs. Derivative Litig.*, No. CV 08-03800 GAF RCx, 2010

15

   U.S. Dist. LEXIS 136744, 2010 WL 5313442 (C.D. Cal. Dec. 27, 2010)............8

*Liberty Lobby*, 477 U.S. 248...................................................................................6

16

*M. G. Chamberlain & Co. v. Simpson*, 173 Cal. App. 2d 263

17

   (Cal. App. 1959) ....................................................................................12, 13, 14

*Mann v. GTCR Golden Rauner, L.L.C*. 483 F. Supp. 2d 884 892

18

   (D. Ariz 2007) ...............................................................................................15

19

*McCormick v. Fund American Companies, Inc.*, 26 F.3d 869

   (9th Cir.1994) ......................................................................................8, 18, 21

20

*Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970) .....................................................7

21

*Nelson v. Serwold*, 576 F.2d 1332 (9th Cir. 1978) ...................................................20

*Neubauer v. Goldfarb*, (2003) 108 Cal. App. 4th 47.................................................15

22

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099 (9th Cir. 2000)...........6

23

*Petro-Ventures, Inc. v. Takessian* 967 F.2d 1337 (9th Cir. 1992).......................10, 11

*Powers v. British Vita, P.L.C.,* 57 F.3d 176, 188089 (2d Cir. 1995) ......................18

24

*Royal Air Properties, Inc. v. Smith*, 321 F.2d 210 (9th Cir. 1964)......................10

*Salehí v. Surfside III Condomìnium Owners Assn.*, 200 Cal.App.4th 1146

25

   (2011) ..............................................................................................11, 12

26

*SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2nd Cir. 1968) ..............................17

27

*Steiner v. Thexton* (2008) 163 Cal. App. 4th 359 ...............................................15, 16

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626

28

   (9th Cir. 1987) ...............................................................................................6

*Thomas v. Birch* (1918) 178 Cal. 483 ............................................................... 15

*TSC Indust., Inc. v. Northway, Inc.,* 426 U.S. 438 ....................................... 18

*TSC Indust., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ............................. 9

*Winet v. Price*, 4 Cal.App.4th 1159 (1992) .......................................... 11, 12

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.* 655 F.3d 1039
 (9th Cir. 2011) ................................................................................................. 17

## Statutes

California Civil Code section 1605 ....................................................................... 15

California Civil Code section 1667 ......................................................................... 7

California Civil Code section 1668 ......................................................................... 7

Welfare and Institutions Code § 15610.30 ................................................. 22, 23

15 U.S.C. § 78cc(b) .................................................................................................. 7


## Other Authorities

Securities Exchange Act of 1934, Section 29(a) ................................................. 7

## Rules

Fed.R.Civ.P. 56(c) ................................................................................................... 6

Plaintiffs Carl Melcher (hereinafter "Melcher") and Melcher Family Limited Partnership (hereinafter "MFLP") (collectively "Plaintiffs") submit the following memorandum of points and authorities in Opposition to Defendant Lance Fried's Motion for Summary Judgment:

## I.   INTRODUCTION

This lawsuit arises from Face It Corporation's (hereinafter "Face It") repurchase of its own stock from MFLP after Face It received a draft term sheet to be acquired.  Neither Face It nor defendant Lance Fried (hereinafter "Fried") ever disclosed this material fact to MFLP before entering the September 12, 2013 stock repurchase agreement ("Redemption Agreement").  Fried argues he cannot be liable because: (1) the release contained in the Redemption Agreement forecloses any liability; and (2) he did not owe a duty to Plaintiffs when he authorized and signed the Redemption Agreement.  Fried's positions are legally and factually incorrect.  It is well established that corporate executives and board members owe fiduciary duties to stockholders.  As the chief executive officer and chairman of Face It's board of directors, Fried owed MFLP a fiduciary duty.  It is also well established that a release contained in a contract procured by fraud invalidates the release.  Likewise, a failure to disclose material facts when entering a contract with someone to whom a fiduciary duty is owed constitutes fraud.  All three legal principles preclude the relief Fried now seeks.

## II.   STATEMENT OF RELEVANT FACTS

MFLP is a California limited partnership. (Declaration of Carl Melcher ("CM Decl."), ¶2).  At all relevant times, Melcher utilized MFLP for estate planning purposes.  (*Id.*). Among other things, MFLP made investments in start-up companies such as Face It.  (*Id.*). Melcher is currently more than 80 years old and was over the age of 65 when he caused MFLP to invest in Face It. (*Id.* at ¶3). Face It was formed in or around 2009 by Fried.

In November 2011, MFLP entered a Subscription Agreement with Face It whereby MFLP purchased approximately thirty percent (30%) of Face It's stock for $2,500,000 cash, plus a $500,000 convertible note. In 2012, MFLP acquired additional Face It stock from a founder for $100,000, making a total investment in Face It of $3,100,000. After these purchases, MFLP was Face It's largest stockholder, owning nearly 32% of Face It. After the initial investment, MFLP funded nearly all of Face It's ongoing operations. Under the Subscription Agreement, MFLP had the right to appoint two members to Face It's board of directors. MFLP appointed Melcher and Kevin Hell.

In the first and second quarters of 2013, Plaintiffs become frustrated with Fried and Face It. (CM Decl., ¶4). This frustration arose from overly optimistic sales presentations at board meetings, in which Fried and the sales team provided glowing sales forecasts that included a list of Fortune 250 companies that were identified as 90% likely to sign a deal in the next 30-60 days. (*Id.*). Few, if any, of these deals came to fruition. (*Id.*). Financial forecasts at the board meetings in late 2012 and 2013 projected twelve month revenue in excess of $10 million, but Face It's actual revenue during that time was less than $200,000, with expenses running at $150,000 to $200,000 each month. (*Id.*). In fact, the only large account Face It ever signed was Cricket Wireless, which never paid for any services. (*Id.*).

On April 2, 2013, Fried, on behalf of Face It, signed a Mutual Nondisclosure Agreement (NDA) with Five9, Inc. ("Five9"). (Fried Decl., Ex. K). By its very words, the April 2013 NDA did not govern merger discussions between Face It and Five9 because the parties specifically agreed that "[I]f the parties desire to pursue business opportunities, the parties will execute a separate written agreement to govern such relationship." (*Id.*).

On April 17, 2013, Fried and Melcher met to discuss Face It's poor performance. (CM Decl., ¶6). Melcher told Fried that Face It only had three options: 1) shut down; 2) find an alternative investor or purchaser; or 3) merge with

another company.  Melcher informed Fried that he assumed Option 1 was not acceptable and opined that Option 2 would be considerably difficult, given Face It's poor performance, which only left Option 3.  (*Id.*).  To this end, Melcher suggested that Fried meet with a company called mBlast to discuss a possible merger.  (*Id.*).  At that time, Face It already had a contractual relationship with mBlast.  (*Id.*).  Fried rejected that proposal and declined to meet with mBlast.  (*Id.*).

Soon thereafter, due to Face It's inability to raise additional capital or close any meaningful sales, MFLP informed Face It in the late spring of 2013 that it would not provide any further funding to Face It. (CM Decl., ¶7).

On July 23, 2013, Fried traveled to Five9's headquarters in San Ramon and met with Five9's senior executives, including Five9's Chairman of the Board, President, Chief Financial Officer, Chief Marketing Officer, VP of Business Development, VP of Sales (who was one of Five9's founders), Senior Director of Marketing Communications, and the Director of Business Development, to discuss partnering opportunities and a potential merger. (Declaration of Philip Tencer, Exs. 1-2.)

On July 24, 2013, Melcher informed Fried that MFLP was willing to be bought out for half of its $3,100,000 investment in Face it, to be paid in full by mid August 2013.  (CM Decl., ¶8).

After returning from San Ramon, Fried responded to MFLP's offer to sell back its stock in a July 25, 2013 email, stating that Face It did not have $1,550,000 to repurchase MFLP's Face It shares and did not have any investor who could do so.  (CM Decl., ¶9).  Instead, Fried proposed Face It repurchase MFLP's stock for $300,000, to be completed on or before October 13, 2013.  MFLP rejected this proposal.  (*Id.*).

On August 7, 2013, Fried had a follow-up meeting at Five9 with its senior management in furtherance of the discussions that began July 23.  Talks of a possible acquisition occurred during that meeting.   (Tencer Decl., Ex. 3).

On August 8, 2013, Fried wrote to Five9's Chief Marketing Officer, confirming Face It was exploring and focused on an acquisition, not a partnership with Five9. (Tencer Decl., Ex. 3).

On August 14, 2013, Five9's Executive VP, Products and VP of Product and Solution Marketing traveled to San Diego to meet with Fried and other key Face It personnel.  (Tencer Decl., Exs. 4-5). The topics discussed at that meeting included: (1) Face It's current partners and limitations in agreements in furtherance of an acquisition or merger; (2) Face It resources; (3) key Face It employees; (4) moving key employees to the Bay Area; (5) consolidating Face It's data center with that of Five9's data center; and (6) Face It's patent portfolio.  (*Id.*).

On August 15, 2013, after MFLP's initial offer to sell its stock back to Face It expired, representatives of Face It and MFLP exchanged emails about a repurchase.  MFLP revised its original repurchase terms by stating that it was willing to allow Face It to repurchase any or all of MFLP's Face It stock for $.1115 per share, to be paid in cash on or before December 31, 2013.  Face It responded by email that it accepted and agreed to buy any or all of MFLP's Face It stock for $.1115 per share, to be paid in cash on or before December 31, 2013.   No consideration was given by MFLP to Face It for this option to repurchase MFLP's stock.  (CM Decl., ¶10).  Fried now claims this was an option contract entered into by MFLP and Face It.

On August 20, 2013, Fried and Five9's Chairman and president, Mike Burkland, had a telephone conversation, after which Fried emailed Burkland with due diligence materials, including Face It 2013 financials, a capitalization table, an organization chart, a list of patents, trademarks and filings in support of same, a list of current partners, and a list of product awards. In the email, Fried wrote to Burkland that Face It was well positioned with a favorable sales channel and would be even more so post-acquisition.  (Tencer Decl., Ex. 6).

Two weeks later, on September 4, 2013, Fried flew up to San Ramon for a one-on-one meeting with Burkland to discuss details about an acquisition. Acquisition price and timing are among the topics discussed. (Tencer Decl., Ex. 7).

The next morning, September 5, 2013, Burkland informed Fried that Five9 was having a board meeting later that day to discuss an acquisition of Face It.  Soon thereafter, Fried instructed Face It's counsel to inform MFLP that Face It would repurchase $25,000 of MFLP's Face It stock within a week. (CM Decl., ¶11).  Later that evening, Burkland informed Fried that Five9's attorneys were drafting a term sheet. The initial term sheet was sent to Fried late in the day with a purchase price of $12 million. (Tencer Decl., Ex. 8).

The next morning, on September 6, 2013, after Fried received the initial term sheet from Five9, Fried directed Face It's counsel to contact MFLP and inform MFLP that Face It would repurchase *all* of MFLP's stock that week.  (CM Decl., ¶12).

Between September 6 and September 12, 2013, attorneys for MFLP and Face It exchanged drafts of the Stock Redemption Agreement.  At the very same time, attorneys for MFLP and Face It were exchanging draft term sheets and Fried and Five9's CEO had several conversations concerning the terms thereof.  (*Id*.).

Finally, on September 12, 2013, Melcher and Fried signed the Redemption Agreement whereby Face It reacquired the stock held by MFLP in exchange for $1.55 million dollars. (*Id*.). Despite the release portion of the Redemption Agreement, it specified that "[a]ll representations, warranties, covenants, and agreements…shall survive the closing."  (*E.g*., Exhibit I to Fried Decl. at p. 4).

Neither Face It nor Fried ever disclosed to Plaintiffs that Face It was engaged in discussions with Five9 to be acquired, much less that they received a term sheet. (CM Decl., ¶13). Further, Fried was well aware that his fiduciary duties to MFLP had not terminated before the Agreement was signed. Both parties acknowledged in

the Agreement that "all rights, duties, and obligations" they owed remained in effect until its effective date. (Fried Ex. I).

On September 13, 2013, the day after Face It repurchased MFLP's stock, Face It and Five9 signed a term sheet for the acquisition of Face It by Five9 for over $13.5 million, which was a valuation that was nearly three times the price Face It paid MFLP for repurchasing its stock the day before.

## III.   STANDARD FOR REVIEW FOR SUMMARY JUDGMENT

The fundamental purpose of summary judgment is to avoid the time and expense of unnecessary trials, "thus conserving the parties' time and money and permitting the courts to husband scarce judicial resources." *Gonzalez v. Torres*, 915 F. Supp. 511, 515 (D.P.R. 1996).

Summary judgment should only be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). Material facts are those that might affect the outcome of the case under the governing law. *Id*. When a defendant moving for summary judgment produces evidence negating an essential element of the plaintiff's claim or shows that the plaintiff lacks sufficient evidence to carry its ultimate burden of persuasion at trial, then the burden shifts to the nonmoving party to present specific facts showing that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

The evidence and all reasonable inferences must be viewed in the light most favorable to the nonmoving party.  As such, summary judgment should be granted only if the nonmoving party fails to present evidence from which a reasonable jury could resolve a material issue in its favor.  *Liberty Lobby*, 477 U.S. at 248-49; *Barlow v. Ground*, 943 F.2d 1132, 1134-36 (9th Cir. 1991); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).

1  It is for this reason that "[t]he party opposing the motion for summary

2  judgment bears the burden of responding *only after* the moving party has met its

3  burden of coming forward with proof of the absence of any genuine issues of

4  material fact." *Celotex*, 477 U.S. at 322-23. Once this occurs, the opposing party

5  must identify facts demonstrating triable issues. (*Anderson v. Liberty Lobby,*

6  *Inc.,* (1986) 477 U.S. 242.)   As such, summary judgment may only be granted

7  where a party fails to make a showing sufficient to establish the existence of an

8  element essential to its case on which that party bears the burden of proof at

9  trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

10  **IV.   ARGUMENT**

11      **A.  The Release is Voidable Because it was Procured by Securities Fraud**

12      The thrust of Fried's motion is that MFLP's claims are barred by the release

13  contained in the Redemption Agreement. Plaintiffs contend that the Redemption

14  Agreement is invalid because that agreement was fraudulently procured by Fried in

15  his role as a corporate fiduciary when he failed to disclose the Five9 merger

16  discussions to Plaintiffs.

17      California Civil Code section 1668 states that "[a]ll contracts which have for

18  their object, directly or indirectly, to exempt any one from responsibility for his

19  own fraud, or willful injury to the person or property of another, or violation of law,

20  whether willful or negligent, are against the policy of the law. California Civil Code

21  section 1667 states in relevant part that an unlawful contract is one that is "contrary

22  to the policy of express law."

23      Similarly, Section 29(a) of the Securities Exchange Act of 1934, renders

24  voidable "[e]very contract made in violation of any provision of [the securities

25  laws] or of any rule or regulation thereunder, and every contract . . . the

26  performance of which involves [such a] violation." 15 U.S.C. § 78cc(b)); *Mills v.*

27  *Elec. Auto-Lite Co*., 396 U.S. 375, 387-88 (1970). In *Facebook v. Pac. Northwest*

28  *Software, Inc.*, the Ninth Circuit stated that plaintiffs would be entitled to rescind

7

their Settlement Agreement if Facebook violated Rule 10b-5. *Facebook, Inc. v. Pac. Northwest Software, Inc.,* 640 F.3d 1034, 1039 (9th Cir. 2011).

The applicable securities rule that is at the heart of this lawsuit is commonly referred to as the "disclose or abstain." rule. Simply put, this rule requires a company or insider to either disclose all material, non-public information about the company or abstain from trading the company's stock. In *Chiarella v. United States*, the Supreme Court discussed this rule and identified two reasons for supporting the duty to "abstain" or "disclose[ ]": it arises from "(i) the existence of a relationship affording access to inside information intended to be available only for a corporate purpose, and (ii) the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure." *Chiarella v. United States* 445 U.S. 222, 227-28 (1980); *see, e.g., McCormick v. Fund American Companies, Inc*., 26 F.3d 869, 876 (9th Cir.1994) (finding a duty to disclose where a shareholder corporation repurchased a former director's shares). The duty to disclose or abstain arises when there is a duty to speak, such as when a fiduciary is involved. *Chiarella,* 445 U.S. at 234-35; *see also Dirks v. SEC*, 463 U.S. 646, 665 (1983) (no 10b-5 violation for nondisclosure absent a breach of fiduciary duty).

To void a contract under Section 29 of the securities act, plaintiffs must prove: (1) a prohibited transaction in the contract; (2) privity with the defendant; and (3) a member of the class of persons the securities acts were entitled to protect. *In re MRV Communs. Derivative Litig*., No. CV 08-03800 GAF RCx, 2010 U.S. Dist. LEXIS 136744, 2010 WL 5313442 (C.D. Cal. Dec. 27, 2010) *citing Berckeley Inv. Group, Ltd v. Colkitt*, 455 F.3d 195, 205 (3d Cir. 2006).

There are triable issues of fact as to whether the Redemption Agreement is voidable. Ample facts exist for a jury to find that the Redemption Agreement, including the release contained therein, was fraudulently procured by Face It and Fried in violation of state and federal securities laws when they failed to either disclose the merger discussions with Five9 or abstain from trading.

Prior to repurchasing MFLP's stock, neither Face It nor Fried disclosed to Plaintiffs that Face It was engaged in merger discussions with Five9 or that Fried received a draft term sheet from Five9 to acquire Face It for $12 million. (Fried's Memorandum of P & A's in Support of Motion for Summary Judgement, at p. 6) (CM Decl., ¶13).

A jury certainly could find that Fried's failure to disclose was material. For an undisclosed fact to be material, "'there must be a substantial likelihood that the disclosures of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988) (*quoting TSC Indust., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Here, Face It repurchased approximately 32% of its outstanding stock from Fried for $1,550,000. (Fried, Ex. E). That equates to a valuation that is slightly more than $4.8 million. The initial term sheet received by Fried from Five9 had a purchase price of $12 million. Certainly a jury could determine that receipt of the Five9 term sheet by Fried and Face It significantly altered the total mix of information that existed after September 5, 2013. If the jury were to so hold, the Redemption Agreement would be a prohibited transaction in violation of state and federal securities laws.

Likewise, there is really no dispute that Fried was a fiduciary to MFLP, given that he was at all times the chief executive officer and chairman of the board for Face It. Finally, the jury could find that MFLP falls into the class of persons that the securities laws were designed to protect, given that it was a shareholder that did not have access to material, non-public information.

For the foregoing reasons, as explained in further detail below, a trier of fact could reasonably find the Redemption Agreement and the release contained therein is voidable and therefore Fried's argument concerning the validity of the release should be denied.

### 1.   The Litigation Exception Does Not Apply Here.

Fried incorrectly asserts the release should be upheld because it is akin to those commonly upheld in lawsuits involving securities violations. (Fried's Memorandum of Points and Authorities, pp.10-12). Those cases represent an exception to the general rule that a release contained in a contract procured by fraud is voidable.  *See, e.g., Royal Air Properties, Inc. v. Smith*, 321 F.2d 210, 213 (9th Cir. 1964); *see also Mills v. Elec. Auto-Lite Co*., 396 U.S. 375, 388 (1970).

One need only look to the cases relied upon by Fried to ascertain their inapplicability here, given that the parties were not adversaries involved in litigation at the time the Agreement was signed.  The Ninth Circuit has made clear that the waiver exception that Fried relies upon is narrow. For parties not involved in litigation who are dealing in an exclusive business relationship, a release is valid for purposes of federal securities claims *only if* there was actual knowledge that such claims existed. *Royal Air Properties,* 321 F.2d at 571. In *Royal Air*, the court explained that a waiver is "the voluntary or intentional relinquishment of a known right" and that it is not intentional or voluntary when the waiver "is predicated upon facts of which one has inquiry, but not actual notice." *Id.*

The Ninth Circuit has also made it clear that there is a material issue of fact for the jury if testimony indicates there was no knowledge of claims until after a release is signed. *Burgess v. Premier Corp*., 727 F.2d 826, 831 (9th Cir. 1984); *see In Jensen v. Dain Bosworth*, *Inc*., No. 90-35797, 1991 U.S. App. LEXIS 31307, (9th Cir. 2010) (holding that credibility of testimony or an affidavit is an issue for the trier of fact where plaintiff submitted affidavit that he lacked knowledge of a federal securities claim when he signed the release). In *Burgess*, the Ninth Circuit upheld the lower court's denial of defendant's summary judgement motion based upon a release, holding that "the intent of the releases, their application to known and unknown facts, and the disclosures and promises surrounding the releases were all questions addressed to the jury." (*Id.*)

The cases relied upon by Fried are the one exception, which involve parties in litigation that contain a settlement of the lawsuit and a release. In *Petro-Ventures, Inc. v. Takessian* 967 F.2d 1337 (9th Cir. 1992), the parties entered into an oil and gas producing partnership which ultimately led to countersuits in Federal court. *After two years of litigation*, the entire action was dismissed when the parties reached a settlement agreement that specifically released federal securities claims based on a mutual understanding that no further litigation would result. The Ninth Circuit held that the mutual release was valid because they were "acting in the adversarial setting that is characteristic of litigation."   *Id.* at 1342.

Likewise, the parties in *Facebook, Inc. v. Pac. Northwest Software, Inc.,* 640 F.3d 1034 (9th Cir. 2011) were adversaries in litigation, with countersuits against each other. They had conducted discovery, mediation and relied upon expert consults when they signed the settlement and release. *Id.* at 1034. Distinguishing contracts involving parties not involved in litigation, the Ninth Circuit upheld the release in the settlement agreement because the parties did not trust one another, were represented by counsel and settled to "establish a general peace." *Id.* at 1039. As such, they accepted the risk that the other side could be misrepresenting facts.

Both cases are distinguishable as the parties in the present lawsuit were not in litigation at the time the release was signed. According to Fried, Face It had an option to repurchase MFLP's stock by a date certain and at a fixed price. (*E.g.*, Exhibit E to Fried Decl. at p. 5.) Without the formal discovery tools of the litigation process, Plaintiffs had no opportunity to learn about Fried's merger negotiations. They were kept in the dark by Face It and Fried – which he freely admits – claiming that he was bound by a confidentiality agreement that Face It and Five9 entered in mid 2013. (*E.g.*, Exhibit K to Fried Decl. at p. 7)

Based on the foregoing, Fried's motion should be denied because a trier of fact could conclude the release was invalid because Fried failed to disclose the merger discussions to Plaintiffs before entering the Repurchase Agreement.

Likewise, Fried's reliance on California cases does not further his argument concerning the release.  In particular, Fried cites *Winet v. Price*, 4 Cal.App.4th 1159 (1992) and *Salehí v. Surfside III Condomìnium Owners Assn*., 200 Cal.App.4th 1146 (2011) as authority that the release is binding.   Neither case is applicable because both involved settlements of then pending litigation.

*Winet v. Price* involved a release that was obtained in prior litigation concerning owed legal fees.  The court of appeals in *Winet* correctly recites California law when it recognized the "general rule is that when a person with the capacity of reading and understanding an instrument signs it, he is, in the absence of fraud and imposition, bound by its contents, and is estopped from saying that its provisions are contrary to his intentions or understanding ...." *Winet*, 4 Cal.App.4th at 1168-69 (citations omitted).  In upholding the release, the *Winet* court found no evidence of fraud and therefore affirmed the validity of the release in question.

*Salehí v. Surfside III Condomìnium Owners Assn*. also involved a settlement of an existing lawsuit.  The *Salehi* court determined that the settlement was entered to "buy" peace.  *Salehí,* 200 Cal.App.4th at 1157.  The *Salehí* court also found that plaintiff "knew or should have known, of additional theoretical claims."  As such, the *Salehíi* court upheld the release.  *Id.* at 1161.

Unlike the narrow exception found in the cases cited by Fried, here there is evidence from which the jury could determine that the parties were not dealing at arm's length when they negotiated and signed the Redemption Agreement.  As explained below, Fried and Face It had a duty to disclose or abstain from purchasing MFLP's stock.  It did neither. Because Fried and Face It had insider knowledge that was material to the value of MFLP's Face It stock, including the receipt of the term sheet from Five9, a jury could conclude that the parties were not on an equal footing.

/ / /

/ / /

**2.    A Release Procured by Fraud is Not Binding in California.**

While the cases relied upon by Fried are the exception to the rule, longstanding California jurisprudence is clear that a release procured by fraud is not binding.  A case on point is *M. G. Chamberlain & Co. v. Simpson*, 173 Cal. App. 2d 263 (Cal. App. 1959).  On review in *M. G. Chamberlain & Co.* was the granting of a demurrer without leave to amend.  In reversing the demurrer, the court in *M. G. Chamberlain & Co.* held plaintiff may proceed with his claim to set aside the release because he has alleged sufficient facts to establish that the release was the product of fraud by omission.

As the court of appeals explained in *M. G. Chamberlain & Co.*.

"Deceit may be negative as well as affirmative, and may consist in the suppression of that which it is one's duty to declare as well as in the declaration of that which is false. (*General Acc. etc. Corp. v. Industrial Acc. Com.*, 196 Cal. 179, 189 [237 P. 33]; *Daily v. Superior Court*, 4 Cal. App. 2d 127, 131 [40 P.2d 936].) [11] An apparent consent is not real or free when obtained by fraud. (Civ. Code, § 1567.)  Where there is a duty to disclose, the disclosure must be full and complete, and any material concealment or misrepresentation will amount to fraud. (*Pashley v. Pacific Elec. Ry. Co.*, 25 Cal. 2d 226, 235 [153 P.2d 325].)  Having undertaken to make representations with respect to the facts, defendants were by law to make an honest statement and not conceal any fact within their knowledge. (*Wilson v. Shultz*, 102 Cal. App. 2d 345, 351 [227 P.2d 524].).… Where it is shown that deception has been practiced in obtaining a release, it may not be considered as a satisfaction of anything not consented to by the claimant. Where a release is procured through fraud and conspiracy, it is immaterial whether the fraud was practiced by an authorized or a self-constituted agent of the releasee. In either event, the releasee should not be allowed to take advantage of an unfair settlement obtained through the fraud of a third party for his benefit. Even persons who were not parties to procuring a release cannot defend its validity against procurement by fraud. (42 Cal.Jur.2d 720, § 23.)  The failure to disclose material facts affecting the essence of a release agreement may constitute actual fraud vitiating the contract. (*Palmquist v. Mercer*, 43 Cal. 2d 92, 100 [272 P.2d 26]. *Also see Dobinson v. McDonald*, 92 Cal. 33 [27 P.

13

1098]; *Walter v. Libby*, 72 Cal. App. 2d 138, 144 [164 P.2d 21]; *Chung v. Johnston*, 128 Cal. App. 2d 157 [274 P.2d 922].)" *M. G. Chamberlain & Co.*, 173 Cal. App. 2d at 275-77.

The court in *M. G. Chamberlain & Co.* further explained that where there is fraud, rescission is unnecessary because the release is void.

> "If it was the intention of the sellers to obtain a release of the very fraud they and the buyers were committing, of which plaintiffs were ignorant, and if they incorporated in it language designed to accomplish that purpose, that in itself would constitute a fraud on plaintiff rendering the release void and rescission unnecessary. (*Sime v. Malouf*, 95 Cal. App. 2d 82, 110 [212 P.2d 946, 213 P.2d 788].) As said in *Sime* (p. 111): "A restoration is not necessary, in order to avoid the bar of a release, where there is no question as to the right of the plaintiff, arising independently of the release itself, to retain what he received. (Campbell v. Birch, 19 Cal. 2d 778 [122 P.2d 902]; *Walsh v. Majors*, 4 Cal. 2d 384 [49 P.2d 598]; *Kales v. Houghton*, 190 Cal. 294 [212 P. 21]; *Matteson v. Wagoner*, 147 Cal. 739 [82 P. 436]; *Richards v. Fraser*, 122 Cal. 456 [55 P. 246]; *Gilson Q. M. Co. v. Gilson*, 47 Cal. 597.) The law does not require, as the price of attack upon a fraudulently induced release, sacrifice of independent rights, or the doing of idle acts. (*See De Garmo v. Petitfils Confiserie*, 93 Cal. App. 261, 275 [269 P. 692].) ... Rescission and restoration are required only under equitable principles and to prevent the taking of unfair advantage. Restoration is not required unless the ends of justice require it." *Id.* at 279.

The court in *M. G. Chamberlain & Co.* further explained that where there is fraud, rescission is unnecessary because the release is void. Based on the foregoing, plaintiffs are not bound by the release that was procured by fraud and that was not entered in the context of litigation. Plaintiffs had no right to discovery. Even if they were on inquiry notice, they could not have discovered the fraud given Fried's declaration that he was bound to keep the discussions with Five9 in strict confidence. (Exhibit K to Fried Decl. at p. 7).

**B. Fried had a Duty to Disclose.**

Fried's second basis for summary judgment is his argument that he was

under no duty to disclose.  He offers four factual reasons why no such duty exists, but ignores the undisputed fact that at all times he was a fiduciary to MFLP in his role as the chief executive officer and chairman of the board of Face It.

### 1.   Fried was a Fiduciary to MFLP.

Fried's other argument for summary judgment is that he did not have a duty to disclose ongoing negotiations between Face It and Five9. To this end he offers five arguments, none of which merit summary judgment.

Before addressing his four arguments, there can be no question that Fried was at all times in a fiduciary relationship with MFLP.  Fried was the chief executive officer of Face It and the chairman of its board of directors.  (Fried Decl. at p. 5).  As such, Fried owed fiduciary duties to the Face It, its board of directors, and all shareholders, including MFLP.  *See, e.g., Mann v. GTCR Golden Rauner, L.L.C.* 483 F. Supp. 2d 884 892 (D. Ariz 2007) (holding that directors and officers 'stand in a fiduciary relationship to their corporation and stockholders'") (citations omitted); *see also Neubauer v. Goldfarb*, (2003) 108 Cal. App. 4th 47, 62 ("directors and majority shareholders owe       a fiduciary       duty to minority shareholders which requires "'complete candor' in disclosing fully 'all of the facts and circumstances surrounding' … "a transaction involving the minority.")

### a.   The August 15, 2013 Email Offer and Acceptance was Not a Contract

Fried argues that the August 15, 2013 email exchanges in which MFLP offered to sell any or all of its Face It stock back to Face It for $.1115 per share, paid in cash, through December 31, 2013 and the purported acceptance by Face It was an option contract.  Not so.  As the California Supreme Court explained in *Steiner v. Thexton* (2008) 163 Cal. App. 4th 359, 369, an option does not become a contract absent consideration.  "[A]n option without consideration is not binding on either party until exercised (*id.* at p. 371); until then, the option "is simply a continuing offer which may be revoked at any time. [Citation.]" (*Thomas v.*

*Birch* (1918) 178 Cal. 483, 489.   California Civil Code section 1605 defines consideration as "[A]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor..." Cal. Civ. Code § 1605.

The Steiner court went on to explain that:

> When by the terms of an agreement the owner of property binds himself to sell on specified terms, and leaves it discretionary with the other party to the contract whether he will or will not buy, it constitutes simply an optional contract." (*Johnson v. Clark* (1917) 174 Cal. 582, 586.) … An option is transformed into a contract of purchase and sale when there is an unconditional, unqualified acceptance by the optionee of the offer in harmony with the terms of the option and within the time span of the option contract. [Citation.]" (*Erich v. Granoff* (1980) 109 Cal.App.3d 920, 928.)… "[A]n option based on consideration contemplates two separate [contracts], *i.e.*, the option contract itself, which for something of value gives to the optionee the irrevocable right to buy under specified terms and conditions, and the mutually enforceable agreement to buy and sell into which the option ripens after it is exercised. Manifestly, then, an irrevocable option based on consideration is a contract . . . ." (*Torlai v. Lee* (1969) 270 Cal.App.2d 854, 858.) Conversely, an option without consideration is not binding on either party until exercised (*id.* at pp. 858-859); until then, the option "is simply a continuing offer which may be revoked at any time." [Citation.]" (*Thomas v. Birch* (1918) 178 Cal. 483, 489.) Civil Code section 1605 defines consideration as "Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor . . . . *Steiner,* 163 Cal. App. 4th at 369, 371.

Here, there was no consideration ever given to MFLP for the option to repurchase MFLP's stock. (Carl Melcher Decl. at p. 3; John Melcher Decl. at p. 3).

16

1   As such, there was never a contract between the parties until September 12, 2013,

2   when they entered the Redemption Agreement.

3                    **b.  Fried was Told Not to Contact Melcher**

4          Fried's next argument to avoid owing a duty is that he was told not to contact

5   Melcher.  (MSJ at pg. 20).  Fried cites no binding authority for his proposition that

6   a fiduciary can avoid obligations when told not to contact the individual to whom

7   fiduciary duties are owed.  Moreover, given that Fried was communicating to

8   Melcher through corporate counsel, this argument lacks merit.

9                    **c.  Fried Had No Legal Duty to Speak.**

10         Fried's next argument is that there can not be a fraud by omission claim

11  absent a duty to speak. (MSJ at pg. 20; Fried Decl., p. 5).  While this legal

12  proposition is true, it does not apply to Fried, who was a fiduciary and had a duty to

13  speak once Face It determined that it was going to repurchase MFLP's stock.

14                   **d.  Repurchase was by Face It, not Fried.**

15         Fried further argues that he is not liable because Face It repurchased MFLP's

16  stock.  (MSJ at pg. 20; Fried Decl., p. 5).  Fried cites no authority for this argument.

17  At all times, Face It acted through Fried, who was the chief executive officer and

18  chairman of the board.  It was Fried who directed MFLP to act.

19                   **e.  The Acquisition Discussions were Too Preliminary to Give**

20                       **Rise to a Duty to Disclose.**

21         Fried's final argument for not having a duty to disclose is that the Five9

22  discussions were "tentative and preliminary.  In making this argument, Fried

23  ignores applicable case law that negates this argument.

24         Federal courts interpret Rule 10b-5 to prohibit trading on the basis of inside

25  information. *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2nd Cir. 1968) (en

26  banc), *cert. denied,* 394 U.S. 976 (1969). In *Texas Gulf,* the court held that

27  corporate officers had violated Rule 10b-5 by trading in their company's securities

28  with nonpublic information that the company had discovered a major ore

reserve. *Texas Gulf,* 401 F.2d at 848.  In so holding, the Second Circuit stated that "anyone in possession of material inside information must either disclose it to the investing public, or, if he is disabled from disclosing it ..., or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed." *Id.; see also WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*  655 F.3d 1039, 1056 (9th Cir. 2011) (a "corporate issuer in possession of material nonpublic information, must, like other insiders in the same situation, disclose that information to its shareholders or refrain from trading with them." (*citing McCormick v. Fund Am. Cos.,* 26 F.3d 869, 876 (9th Cir.1994).).

   As the Supreme Court has explained, the duty to abstain or disclose arises from "(i) the existence of a relationship affording access to inside information intended to be available only for a corporate purpose, and (ii) the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure." *Chiarella v. United States,* 445 U.S. 222, 227-28 (1980).  The "abstain or disclose" rule has been applied when a corporation repurchases its own shares.  *See, e.g., McCormick v. Fund American Companies, Inc.,* 26 F.3d 869, 876 (9th Cir. 1994) (finding a duty to disclose where a corporation repurchased shares from a former director); *see also Powers v. British Vita, P.L.C.,* 57 F.3d 176, 188089 (2d Cir. 1995) (holding that "a fiduciary relationship or other relationship of trust and confidence can give rise to a duty to disclose material information; unique access to information can also trigger such a duty").

   The Supreme Court has further explained that the key question is not whether negotiations are preliminary, but rather, whether a reasonable investor would consider the undisclosed fact material in making his or her investment decision. *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988). For an undisclosed fact to be material, "'there must be a substantial likelihood that the disclosures of the omitted fact would have been viewed by the reasonable investor as having significantly

altered the `total mix' of information made available.'" *Id.* at 231-32 (quoting *TSC Indust., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)).

Here, the undisclosed fact was that Face It had received a term sheet to be acquired for $12 million before it repurchased MFLP's stock at a valuation that was less than $5 million.  (*See, e.g.,* Declaration of Philip Tencer, Ex. 8.)  A jury certainly could find that a reasonable investor would have viewed the draft term sheet as having significantly altered the total mix of information made available to MFLP.

Fried offers several additional arguments without legal support. For example, he argues that Melcher and MFLP were not owed a fiduciary duty because: 1) Melcher and MFLP's other designated board representative resigned a month before entering the Repurchase Agreement; and 2) MFLP was bought out before the merger term sheet was signed. (MSJ, pp. 5-6.)  Fried further argues that the Five9 NDA prevented him from disclosing the negotiations. (*Id.* at p. 20.)  Nothing in that agreement precluded him from upholding his duty of care and loyalty. If the NDA truly precluded Fried's disclosure, Face It should have abstained from repurchasing MFLP's Face It stock.

Lastly, the fact that Plaintiff's buy out took place between two "authorized agents, the attorneys", does not further Fried's argument for summary judgment. Neither Fried nor Face It's agent disclosed the pending merger. Fried conveniently omits: 1) *his* attorney reinitiated communications with Plaintiff's counsel for the buyout hours after Fried had been informed by Five9's president that Five9's board would be discussing a merger later that evening, (Tencer Decl., Ex. 9) and 2) *his* attorney sent a subsequent follow-up communication the next morning offering *a complete buyout* after Fried had received a draft of the merger term sheet the night before.  (CM Decl., ¶12.)

As such, Fried's motion should be denied as there is a triable issue of material fact as to whether he owed Plaintiffs a duty to disclose the merger

19

negotiations with Five9.

### 2. Fried's Failure to Abstain or Disclose Material Information was a Breach of His Fiduciary Duty.

Fried admits he never disclosed the ongoing merger negotiations to Plaintiff. (MSJ, pp. 1-6).   To now claim that he did not receive a personal benefit is irrelevant. Fried breached his duties when he failed either to direct Face It to abstain from repurchasing MFLP's stock or to disclose material information to plaintiffs about the merger negotiations.    In so doing, he committed fraud and violated applicable state and federal securities laws.

Two cases with facts similar to the present action are instructive. In *Dungan v. Colt Industries, Inc.*, 532 F. Supp. 8327, (N.D. ILL, 1982) the court held that company directors had breached a duty of disclosure because at the time plaintiff shareholder signed a settlement agreement with them in a separate lawsuit, they knew all of the conditions had been met for a successful sale of the company. *Dungan*, 532 F. Supp. 832, 837 (citing *Nelson v. Serwold*, 576 F.2d 1332, 1336-38 (9th Cir. 1978). The *Dungan* court was unpersuaded by defendants' argument that the acquisition agreement was completed a month after the shareholder agreement was signed. The information in their possession at the time plaintiff agreed to the settlement was material because reasonable inferences indicated the company seriously contemplated the sale *prior* to negotiating with the plaintiff shareholder and *that* fact alone would have materially affected the value of his sock.  *Id*. at 837. The *Dungan* court found defendants violated federal securities laws because they failed to disclose information in their possession.  *Id*.

Similarly, in *Guarino v. Interactive Objects, Inc.,* 122 Wn. App. 95 (Wash. Ct. App., 2004) the court found that a chief financial officer and two board members breached their duty to disclose material information about a merger or abstain from purchasing stock as part of mutual releases and settlement agreements. *Id.* at 101.  The court in *Guarino* was unpersuaded by defendants' argument that the

1    formal merger agreement was signed after the settlement agreement. *Id*. at 107.
2    Although it was signed three weeks *after* the settlement agreement, the court in
3    *Guarino* still found the merger plans had been imminent since it had been approved
4    *the day after* the settlement agreements were entered. *Id*. at 117. The court in
5    *Guarino* analyzed the omissions as of the date of the settlement agreement,
6    specifically noting "the duty to disclose or abstain is ongoing…Materiality is
7    determined relative to the date of the sale, not merely the date of any
8    communications." *Id*. at 115.

9        The *Guarino* court was also unpersuaded by the argument that defendants
10   warned plaintiffs the company needed a merger to survive, because this was
11   insufficient for plaintiffs to evaluate what they stood to gain or lose since "[they]
12   did not have knowledge of the identity of the potential merger partner or of other
13   facts which would be material to evaluate a potential increase or decrease in the
14   value of their stock."  *Id*. at 118. The *Guarino* court further rejected defendants'
15   argument that plaintiffs knew or should have known of a pending merger because
16   they knew of the company's dismal financial outlook, stating that "a shareholder's
17   former role as an officer or director of an issuer corporation does not foreclose
18   operation of the disclose or abstain rule. *Id*. at 113 (citing *McCormick,* 26 F.3 876).
19   Lastly, the *Guarino* court found defendants controlled the transaction in that they
20   acted "as signatories to the settlement agreement…[thereby] they confirmed the
21   company's repurchase of the plaintiff's shares without disclosing information about
22   the merger negotiations." *Id* at 119.

23       Similar to the foregoing two cases, Fried never apprised MFLP or Melcher
24   about the discussions concerning a possible sale of Face It to Five9. At the time
25   Fried signed the Redemption Agreement, he had already received a term sheet from
26   Five9.  Certainly a jury could find that the proposed merger was imminent and
27   material, giving rise to a duty to disclose. Without knowledge surrounding the
28   merger negotiations, plaintiffs were kept in the dark and deprived of the right to

properly evaluate repurchase. As such, Fried's motion should be denied as there is a triable issue of material fact as to whether he breached his fiduciary duty and violated state and federal securities laws by failing to disclose the merger discussions with Five9.

### C. Triable Issues of Fact Exist as to Whether Fried Wrongfully Deprived Melcher of His Personal Property.

Fried's only argument against Melcher's financial elder abuse claim is his contention that there was no wrongful activity. Under the Elder Abuse and Dependent Adult Civil Protection Act codified in Welfare and Institutions Code § 15610.30, Financial abuse of an elder or dependent adult occurs when a person or entity does any of the following:

(1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.

(2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.

(3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence, as defined in Section 15610.70.

The taking is "wrongful" if the "person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult." (*Id*. (b).) Taking occurs whenever a "a person or entity takes, secretes, appropriates, obtains, or retains real or personal property when an elder or dependent adult is deprived of any property right, including by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a

22

1 │ representative of an elder or dependent adult." (*Id*. (c).)

2 │       Melcher became a founding stockholder through MFLP. Fried was aware

3 │ Melcher utilized MFLP for investments in start-up companies as well as an estate

4 │ planning tool. Melcher was in his late 70s when he executed the Redemption

5 │ Agreement. He invested $3.1 million purchasing more than thirty one percent

6 │ (31%) of Face It. On September 13, 2013, the day after Face It repurchased

7 │ MFLP's stock, Face It and Five9 signed a term sheet for the acquisition of Face It

8 │ by Five9 for over $13.5 million, which was a valuation that was more nearly three

9 │ times the price Face It paid MFLP for repurchasing its stock the day before. Fried's

10 │ argument that his actions were do not rise to the level of wrongful are contrary to

11 │ these facts. As such, Fried's motion should be denied as there is a triable issue of

12 │ material fact as to whether Fried's actions arose to the level of financial elder abuse.

13 │ **V.    CONCLUSION**

14 │       The evidence set forth herein raises triable issues of fact as to whether Fried

15 │ breached his fiduciary duties. Applicable and binding caselaw instructs that the

16 │ release in the Redemption Agreement is not enforceable because it was procured by

17 │ fraud.  For these reasons, Plaintiffs respectfully request that the Court summarily

18 │ deny Fried's motion for summary judgment on the grounds that there are triable

19 │ issues of material facts as set forth above.

20 │ DATED:  October 15, 2018        TENCERSHERMAN LLP

21 │

22 │            By:_____

23 │             Philip C. Tencer

24 │             S. Ivette Kuyateh

            Attorney for Plaintiffs

25 │             Carl Melcher & Melcher Family

            Limited Partnership

26 │

27 │

28 │