**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

CARL MELCHER, *et al.*,

                      Plaintiffs,

     v.

LANCE FRIED,

                   Defendant.

Case No. 16-cv-2440-BAS-BGS

**ORDER DENYING DEFENDANT LANCE FRIED'S MOTION FOR SUMMARY JUDGMENT**

**[ECF No. 47]**

     Before the Court is Defendant Lance Fried's ("Fried") motion for summary judgment on all federal and state law claims asserted in this action. (ECF No. 47.) Plaintiffs the Melcher Family Limited Partnership ("MFLP") and Carl Melcher ("Melcher") (together, "Plaintiffs") oppose (ECF No. 51) and Fried has replied in support (ECF No. 53). The Court finds the motion suitable for determination on the papers submitted and without oral argument. *See* Civ. L. R. 7.1 (d)(1). For the reasons herein, the Court denies Fried's motion.

**OVERVIEW**

     This case arises from a repurchase agreement in which Face It Corporation ("Face It"), a company of which Fried was a founder as well as the Chief Executive Officer and Chairman of the Board of Directors, agreed to repurchase MFLP's shares of Face It stock. MFLP, of which Melcher is a limited partner, claims that Fried

failed to disclose that Face It was in merger discussions with another company, Five9, Inc. ("Five9") at the time a Redemption Agreement was drafted and finalized. Five9 sent Fried a draft merger term sheet term a week before the repurchase was completed, the merger term sheet was finalized two days after the repurchase, and Face It merged into Five9 about a month later. Melcher contends that he would not have sold MFLP's shares if he had known about the Five9 merger discussions.

## BACKGROUND[1]

MFLP is a California limited partnership, which invests in start-up companies. (ECF No. 51-1, Carl Melcher Decl. ("Melcher Decl.") ¶ 2.) Melcher utilized MFLP for estate planning purposes and he was over 65 years old when he caused MFLP to invest in Face It. (*Id.* ¶¶ 2–3.) At all relevant times, Fried, one of Face It's founders, was Face It's CEO and the Chairman of its Board of Directors (the "Board"). (ECF No. 55, Joint Statement of Undisputed Facts ("JSUF") ¶ 7; *see also* ECF No. 47-2, Lance Fried Decl. ("Fried Decl.") ¶ 2 ("During the times in question I was the [CEO] at Face It, acting at the direction of Face It's board.").

***The Investment and Soured Relations.*** The tale of the present action dates to 2011 when MFLP invested some $3.1 million in Face It in exchange for Face It stock. (JSUF ¶ 1; Fried Decl. ¶ 3.) Because of the amount of Face It stock it now owned, MFLP was entitled to name representatives to two Board seats, to which it named Melcher and Kevin Hell. (Fried Decl. ¶ 3; ECF No. 47-3, Michelle Brown Decl. ("Brown Decl.") ¶ 2; *cf.* JSUF ¶¶ 4–5.) Euphoria from the investment soon wore off.

By early through mid-2013, Melcher had grown frustrated with Face It and Fried for "overly optimistic sales forecasts," deals that did not materialize, and his view that Face It's monthly costs far exceeded its revenues. (Melcher Decl. ¶ 4; Fried

---

[1] The Court describes the relevant background based on the parties' joint statement of undisputed facts as well as the declarations and accompanying exhibits the parties have submitted in connection with their papers. (*See* ECF Nos. 47-2, 47-3, 47-4, 51-1, 51-2, 51-3, 53-1, 55.) Although the Court addresses evidentiary objections at a later point in this order, the Court notes that it has overruled all objections.

Decl. ¶ 6; ECF No. 51-2, John Melcher Decl. ("J.M. Decl.") ¶ 3.)  Around April 17, 2013, Melcher and his son, John Melcher, an MFLP limited partner, met with Fried "to discuss Face It's poor performance" and outlined the "options" they believed Face It had: (1) shut down, (2) find an alternative investor or purchaser, or (3) merge with another company.  (Melcher Decl. ¶ 6; Fried Decl. ¶ 6, Ex. C (memorandum of meeting); J.M. Decl. ¶¶ 1, 5.)  Melcher did not believe Fried would accept a shutdown and he did not believe an alternative investor would come forward "given Face It's poor performance."  (Melcher Decl. ¶ 6; J.M. Decl. ¶ 5.)  Thus, he recommended to Fried that Face It consider a merger with another company called mBlast—a suggestion which Fried rejected.  (Melcher Decl. ¶ 6; Fried Decl. ¶ 7.)

***Initial Repurchase Discussions.***  Faced with a soured relationship and divergent views about Face It's direction, by July 2013, Melcher "was ready to walk away from Face It and [he] informed Fried on July 24, 2013 that MFLP was willing to be bought out for half of its $3,100,000 investment in Face It, to be paid in full by mid-August 2013."  (Melcher Decl. ¶ 8; *see also* JSUF ¶ 2; Fried Decl. ¶ 16.)  For his part, Fried "did not want a disgruntled investor in the mix, one that held approximately 30% of the stock, so I looked for ways to have MFLP bought out so the company could survive."  (Fried Decl. ¶ 11.)

But Fried was "not clear" on Melcher's offer and indicated "it is extremely unlikely we will be able to raise anything substantial before August 13[,] 2013."  (Fried Decl. ¶ 16 Ex. E; Brown Decl. ¶ 8 Ex. B.)  Fried interpreted Melcher to have demanded $300,000 in cash with the remaining $1.2 million to come from "tax treatment" on MFLP's losses and then suggested a buyout date of October 13, 2013.  (Fried Decl. ¶¶ 15–16 Ex. E.)  Thereafter, Fried sent Melcher a draft agreement with a buyout date of August 13, 2014.  (Fried Decl. ¶ 17, Ex. F; Brown Decl. ¶ 9 Ex. C.)  Melcher avers that Fried effectively made a new repurchase proposal given the new buyout deadline, a proposal which Melcher rejected.  (Melcher Decl. ¶ 9.)

Discussions appear to have stopped until August 13, 2013.  Because Fried was

apparently "peppering" Melcher with emails, Gary Brenner, Melcher's attorney, informed Michelle Brown, Face It's attorney, that Melcher "no longer wishes to speak or communicate with [] Fried regarding this subject" and instructed that Fried should communicate only with Brenner about the repurchase. (Brown Decl. ¶ 11 Ex. D; Fried. Decl. ¶ 19.) Brenner then stated "MFLP's offer":

> MFLP is willing to sell all or part of its currently held 13,901,344 common shares of Face It [] at the purchase price of $0.115 (i.e., 11.15 cents) per share—a fifty percent reduction of its original purchase price. All shares must be purchased and paid no later than December 31, 2013. Shares will only be sold for cash (or a cashier's check) for the entire amount of the sale. There will be no seller financing or no delayed payments.

(Brown Decl. ¶ 11 Ex. D; Melcher Decl. ¶ 10 (describing this as MFLP's "revised" offer).) On August 15, 2013, Brown sent Face It's acceptance of the offer's terms verbatim in an email which concluded "[t]his email . . . is intended to constitute a binding agreement." (Brown Decl. ¶ 11 Ex. E.) Later that day, Melcher resigned from the Board. (JSUF ¶ 4; Brown Decl. ¶ 12 Ex. F; Fried. Decl. ¶ 20 Ex. G.) Hell resigned the next day. (JSUF ¶ 5; Brown Decl. ¶ 12 Ex. F; Fried. Decl. ¶ 21 Ex. G.)

***The Redemption Agreement and Closing.*** In the ensuing weeks, Brenner and Brown drafted the Redemption Agreement (the "Agreement"). (Brown Decl. ¶¶ 15–16; Melcher Decl. ¶ 12.) Upon Face It's demand, the Agreement included a release (the "Release"). (JSUF ¶ 9.) The Release provides that "except for those covenants, representations, and agreements by the Parties set forth in this Agreement," the parties and related parties, defined to include officers, are released from "any and all liability," including for unknown claims through a specific waiver of California Civil Code § 1542.[2] (Fried Decl. Ex. I § 6.) Notwithstanding the Release, the Agreement provides for arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement[.]" (*Id.* § 11.1.) Bearing a September 9, 2013 date, the Agreement

---

[2] Section 1542 provides that "a general release does not extend to claims which a creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor." Cal. Civ. Code § 1542.

constitutes the agreement for Face It to repurchase all MFLP shares in exchange for MFLP's receipt of over $1.5 million. (Fried Decl. ¶ 24 Ex. I §§ 1–2.) Melcher, acting for MFLP, and Fried, acting for Face It, both signed the Agreement on September 12, 2013. (*Id.*; JSUF ¶ 6; Fried Decl. ¶ 24; Brown Decl. ¶ 16; Melcher Decl. ¶ 12.) That day, Face It sent MFLP the $1,549,999 payment for the stock. (JSUF ¶ 6; Brown Decl. ¶ 16; Fried Decl. ¶ 24.) The deal was consummated.

***The Face It Merger into Five9***. Contemporaneous with the tumult between Face It and MFLP was Face It's discussions with Five9. Through Fried, Face It's discussions with Five9 regarding "possible deals"—albeit not a merger—first occurred in spring 2013 and resulted in a Non-Disclosure Agreement (the "NDA"). (Fried Decl. ¶ 26 Ex. K.) Not much else came from these general deal discussions. But "[i]n the midst" of the MFLP discussions, Fried "look[ed] for ways to salvage the company" and Face It and Five9 "reinstituted" contact. (*Id.* ¶¶ 26, 28.) In late August 2013, Fried engaged "with Five9 about it becoming an investor, customer, or other form of partner." (*Id.* ¶ 28.)

Fried avers that "[a]fter Labor Day 2013," the talks "morph[ed]" into Five9 "potentially acquiring" Face It. (*Id.* ¶ 29.) On September 5, 2013, Five9 sent Face It "an unsigned, draft, non-binding term sheet" for the merger. (JSUF ¶ 10; *see also* Fried Decl. ¶ 30.) The draft term sheet reflected a complete buyout of Face It by Five9 for an amount equal to $12 million, with $2 million in cash and $10 million in Five9 shares. (ECF No. 64, Philip Tencer Decl. ("Tencer Decl.") ¶ 9 Ex. 8.) Face It and Five 9 signed a finalized merger term sheet on September 14, 2013, which upped the buyout price to $13.5 million with $3 million in cash and $10.5 million in Five9 shares. (JSUF ¶ 11; Fried Decl. ¶ 30 Ex. L.) Five9 acquired Face It on October 18, 2013. (JSUF ¶ 12.) Five9 paid about $2.9 million in cash and gave restricted Five9 shares internally valued at $10.5 million. (Fried Decl. ¶ 31.)

Central to this case is Plaintiffs' contention that Fried failed to disclose to the Five9 merger discussions and, more concretely, the draft term sheet's price tag when

repurchasing MFLP's shares. Fried contends that he "did not believe there was any obligation to disclose this to Carl Melcher or MFLP" because Melcher and MFLP's other board designee had resigned and "Melcher did not hold any officer or employer titles." (Fried Decl. ¶ 29.) In Fried's view, "[a]t best MFLP was one of the many Face It stockholders[.]" (*Id*.) Melcher declares that at no time prior to repurchase did Face It or Fried ever disclose the Five9 merger talks. (Melcher Decl. ¶ 13.) Melcher wanted MFLP to be bought out because he believed it was the only viable option to recoup MFLP's investment, but he would not have sold MFLP's shares if he had known about the potential Five9 merger. (*Id*.; *see also* J.M. Decl. ¶ 12.)

*Procedural History.* MFLP and Melcher commenced this action on September 28, 2016 against Five9, Face It's successor from the merger, and Fried, claiming violations of federal and state securities laws, breach of fiduciary duty, fraud, and California state law elder abuse. (ECF No. 1.) Within a month of suit, Five9 and Plaintiffs jointly moved to arbitrate the claims against Five9 pursuant to the Agreement's arbitration provision, which the Court granted with a stay of this action. (ECF Nos. 7, 8.) After Five9 and Plaintiffs settled and upon Plaintiffs' motion, the Court lifted the stay in June 2017 and reopened this case. (ECF Nos. 10, 11.)

In the Second Amended Complaint ("SAC"), MFLP raises six claims against remaining Defendant Fried for: (1) violation of Section 10(b) and Rule 10b-5, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5(b), (SAC ¶¶ 34–37); (2) Section 20(a) "controlling person" liability for violations of Section 10(b) and Rule 10b-5, 15 U.S.C. § 78t(a) (*id*. ¶¶ 38–39); (3) violation of California securities laws, Cal. Corp. Code §§ 25401, 25402, and 25501, (*id*. ¶¶ 40–44); (4) common law fraud, (*id*. ¶¶ 45–51); (5) breach of fiduciary duty, (*id*. ¶¶ 52–57); and (6) rescission, (*id*. ¶¶ 66–69). Melcher alone asserts a cause of action for "elder abuse," Cal. Welfare & Institutions Code § 15610.30. (*Id*. ¶¶ 58–65.) Fried has answered (ECF No. 44) and seeks summary judgment (ECF No. 47).

# LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is proper on "each claim or defense" "or the part of each claim or defense" on which summary judgment is sought when "there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the suit under the governing law, and a dispute is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). At summary judgment, the court does not make credibility determinations or weigh conflicting evidence, but instead views the evidence and draws all reasonable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. 242 at 255.

The moving party has the initial burden of demonstrating the absence of a genuine factual dispute, which it may satisfy by either affirmatively negating the nonmoving party's claim, or by demonstrating that the nonmoving party is unable to prove an essential element of that claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Jones v. Williams*, 791 F.3d 1023, 1030 (9th Cir. 2015); *see also* J. Friedenthal, M. Kane, & A. Miller, *Civil Procedure* § 9.3, p. 457, n.81 (5th ed. 2015). To meet this burden, the moving party cites to depositions, affidavits or declarations, interrogatory answers, or other materials in the record. Fed. R. Civ. P. 56(c)(1). Only if the moving party meets its initial burden must the nonmoving party go beyond its pleadings and, by its own evidence or by citing appropriate materials in the record, show by sufficient evidence that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [w]here the record as a whole

could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Anderson*, 477 U.S. 242 at 252 (a "scintilla of evidence" in support of the nonmoving party is insufficient, rather "there must be evidence on which the jury could reasonably find for the [nonmoving party].").

## EVIDENTIARY ISSUES

Before turning to the merits of Fried's motion, the Court addresses some evidentiary objections. Only Fried has raised objections, specifically to all nine exhibits attached to the declaration of Plaintiffs' counsel, Philip Tencer. (ECF No. 53-2.) Fried generally objects that "[t]here is no proper foundation for those, as they appear to be e-mails between other parties with no proof that they were ever sent and the like." (*Id.* at 1.)[3] The Court overrules these objections.

To give a document foundation at trial, the proponent need only make a showing of authenticity sufficient to allow a reasonable juror to find that the matter in question is what its proponent claims. *United States v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000) (citing Fed. R. Evid. 901(a)). At summary judgment, "Rule 56[(c)] requires only that evidence 'would be admissible', not that it presently be admissible." *Burch v. Regents of Univ. of Cal.*, 433 F.Supp.2d 1110, 1120 (E.D. Cal. 2006). "[A] party does not necessarily have to produce evidence in a form that would be admissible at trial" to survive summary judgment. *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001). The focus is on the admissibility of the evidence's

_____

[3] Fried also passingly objects that all nine exhibits are hearsay. (ECF No. 53-2 at 1.) This objection is "boilerplate and devoid of any specific argument or analysis as to why any particular exhibit or assertion in a declaration should be excluded" on this basis. *United States v. HVI Cat Canyon, Inc.*, 213 F. Supp. 3d 1249, 1257 (C.D. Cal. 2016); *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1033 (C.D. Cal. 2013) (refusing to "scrutinize each objection and give a full analysis of identical objections"); *Amaretto Ranch Breedables v. Ozimals, Inc.*, 907 F. Supp. 2d 1080, 1081 (N.D. Cal. 2012) ("This Court need not address boilerplate evidentiary objections."); *Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010) (noting that "it is often unnecessary and impractical" to scrutinize "boilerplate recitations of evidentiary principles or blanket objections") (citation omitted). The Court thus overrules Fried's general hearsay objection to the exhibits.

– 8 –

contents, rather than the form in which it is presented. *Estate of Hernandez–Rojas ex rel. Hernandez v. United States*, 62 F. Supp. 3d 1169, 1174 (S.D. Cal. 2014) (citing *Fonseca v. Sysco Food Servs. of Ariz., Inc*., 374 F.3d 840, 846 (9th Cir. 2004); *see also Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (same).

"Even if the non-moving party's evidence is presented in a form that is currently inadmissible, such evidence may be evaluated on a motion for summary judgment so long as the moving party's objections could be cured at trial." *AtPac, Inc. v. Aptitude Sols., Inc*., 787 F. Supp. 2d 1108, 1111 (E.D. Cal. 2011). Authentication and hearsay challenges at the summary stage may be overruled when the evidence could be presented in an admissible form at trial. *See Lawrence v. City & Cty. of San Francisco*, 258 F. Supp. 3d 977, 986 (N.D. Cal. 2017) (overruling objections to admissibility of police reports on authentication and hearsay grounds at summary judgment because the contents of the report "may be presented in an admissible form at trial"); *Faulks v. Wells Fargo & Co*., 231 F. Supp. 3d 387, 397-98 (N.D. Cal. 2017) (overruling objections to admissibility of exhibit at summary judgment because "it is possible that the facts underlying [the exhibit] could be admissible at trial").

Fried first objects that "Attorney Tencer simply says Exhibits 1–8 were produced in discovery by a third party[.]" (ECF No. 53-2 at 1.) Tencer declares that all these exhibits were produced by Five9, Face It's successor in interest and a former defendant and current non-party, in response to a third party subpoena issued in discovery and each of the exhibits bears a production stamp. (ECF No. 64 ¶¶ 2–9, Exs. 1–8.) It is clear from the description of each exhibit and the exhibits themselves, that the documents are what they purport to be. *See* Fed. R. Evid. 901(b)(4) (a document's "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances" is evidence sufficient to satisfy the authentication requirement). In addition, Fried's objection to Exhibit 8—an email chain between Fried and Five9 employees which contains the

September 5, 2013 draft term sheet for the Face It and Five9 merger—is not well taken. Fried's summary judgment declaration expressly avers that "Five9 sent a non-binding draft term sheet on September 5, 2013" which "was not signed by Five9," but curiously fails to provide the draft term sheet. (Fried Decl. ¶ 29.) At a minimum, Plaintiffs offer the exhibit in direct response to Fried's omission. The Court is satisfied at this juncture that the facts in the exhibit would be admissible at trial.

Fried also objects to Exhibit 9. (ECF No. 53-2 at 1.) Exhibit 9 is an email communication between counsel for Face It and MFLP, dated September 6, 2013. (ECF No. 64 Ex. 9.) It bears noting that MFLP and Melcher—the actual plaintiffs—are the proponents of this information. In his summary judgment declaration, Melcher, a limited partner of MFLP, refers to receipt of the email communication by MFLP's attorney and expressly refers to the factual contents of Exhibit 9. (ECF No. 51-1 ¶¶ 11–12.) Thus, the Court is satisfied that Fried's objection can be cured at trial. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 774 n.8 (9th Cir. 2002) ("'A document can be authenticated [under Rule 901(b)(1)] by a witness who wrote it, signed it, used it, or saw others do so.'" (citation omitted)).

## DISCUSSION

### A. The Enforceability of the Agreement's Release Against Plaintiffs' Claims

Fried pleaded as an affirmative defense that all claims "are barred by the terms of a release." (ECF No. 44 at 2.) He now seeks summary judgment on Plaintiffs' claims based on the Release in the Agreement. (ECF No. 47-1 at 8–15.) The Court concludes that the Release does not bar either the federal or state claims.

#### 1. The Release Is Invalid as to MFLP's Federal Securities Claims

"[F]ederal law governs all questions relating to the validity of and defenses to purported releases of federal statutory causes of action." *Petro-Ventures, Inc. v. Takessian*, 967 F.2d 1337, 1340 (9th Cir. 1992). MFLP claims violations of Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934. (SAC ¶¶ 34–39.) Even if the claims fall within its scope, the Release does not bar them.

Section 29(a) of the Securities Exchange Act of 1934 is the starting point for assessing the validity of a release of federal securities law claims. The provision provides that: "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void." 15 U.S.C. § 78cc(a). "This antiwaiver provision generally invalidates blanket releases of liability that accompany the purchase or sale of securities." *Pasternack v. Shrader*, 863 F.3d 162, 171 (2d Cir. 2017); *Vacold LLC v. Cerami*, 545 F.3d 114, 122 (2d Cir. 2008) ("[W]e do not give effect to contractual language . . . purporting to be a general waiver or release of [securities-fraud] liability altogether."). From this anti-waiver provision derives "the general rule [] that unknown or subsequently maturing causes of action may not be waived" when "dealing with federal securities." *Petro-Ventures, Inc.*, 967 F.2d at 1341.

Although Section 29(a)'s language suggests that a release of federal securities claims is void, Ninth Circuit precedent elaborates conditions under which a release may nevertheless bar federal securities law claims. In *Burgess v. Premier Corp.*, the Ninth Circuit held that "a release is valid for purposes of federal securities claims only if [there was] 'actual knowledge' that such claims existed." 727 F.2d 826, 831–32 (9th Cir. 1984) (citing *Royal Air Properties, Inc. v. Smith*, 333 F.2d 568 (9th Cir. 1964)); *see also Petro-Ventures, Inc.*, 867 F.2d at 1338 (discussing *Burgess* as setting forth the "general rule in this circuit" regarding releases of federal securities claims). In *Burgess*, five plaintiff doctors invested in cattle based on the defendants' allegedly deceptive representation of quality, a misrepresentation which caused the plaintiffs to suffer significant losses. *Burgess*, 727 F.2d at 830. Unaware of potential securities fraud, each plaintiff had signed a document in connection with their investment, which purported to release the defendant corporation and the defendant directors from all claims. *Id.* at 832. The Ninth Circuit held that the release did not bar the plaintiffs' subsequent federal securities claims because there was sufficient evidence

to show the plaintiffs lacked actual knowledge of their claims at the time they executed the release. *Id.* Fried does not argue that MFLP had actual knowledge of potential securities fraud based on the failure to disclose the Five9 merger disclosures either at, or any time before, Melcher signed the Agreement on September 12, 2013. The only evidence of knowledge before the Court are declarations from Melcher and another MFLP partner, which disavow such knowledge. (Melcher Decl. ¶ 13; J.M. Decl. ¶ 12.) Therefore, if *Burgess* applies, the Release does not bar MFLP's federal securities claims.

Fried, however, seeks to rely on the "exception" to *Burgess* the Ninth Circuit recognized in *Petro-Ventures* for releases contained in litigation settlement agreements. *Petro-Ventures*, 967 F.2d at 1338 ("[W]e must decide if the facts of this case warrant an exception to [the *Burgess*] rule."). In *Petro-Ventures*, the Ninth Circuit enforced a release in a settlement agreement that arose from a property dispute and by which the parties "knowingly gave up all rights to future litigation that might arise out of the transaction." *Id.* at 1343. Notwithstanding the release in the earlier litigation settlement agreement, the plaintiff brought suit for alleged securities fraud. Pointing to an earlier Second Circuit decision, the Ninth Circuit held that the release, "signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel," was "unambiguous in conveying the intent of the parties to release all unknown claims" and should therefore be enforced. *Id.* at 1342 (quoting *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir. 1977)) (internal quotation marks omitted). The Ninth Circuit distinguished between buyers of securities "in an exclusively business relationship," like the parties in *Burgess*, and those "acting in the adversarial setting that is characteristic of litigation." *Id.* at 1341–42.

The Ninth Circuit most recently applied the *Petro-Ventures* exception in *Facebook, Inc. v. Pacific Northwest Software, Inc.*, 640 F.3d 1034 (9th Cir. 2011), a case in which the parties had similarly entered into a litigation settlement agreement

with a mutual release of all claims. The Court upheld the release even as to federal securities claims, noting that "[w]hen adversaries 'in a roughly equivalent bargaining position and with ready access to counsel' sign an agreement to establish a general peace, we enforce the clear terms of the agreement," even when potential securities fraud is later discovered. *Id.* at 1039. Underscoring the importance of the litigation context to upholding the release, the Ninth Circuit observed that without enforcement, "[a] release in such an agreement would be useless to end litigation if it couldn't include claims arising from the settlement negotiations." *Id.* at 1040.

Fried has failed to show that *Petro-Ventures* exception applies to render the Release a valid bar to MFLP's federal securities claims. First, unlike *Petro-Ventures* and *Facebook*, MFLP and Melcher, on the one hand, and Face It and Fried, on the other, were simply not "acting in the adversarial setting that is *characteristic of litigation*." *Petro-Ventures*, 967 F.2d at 1342. Contrary to the repeated misleading characterizations of the Agreement as a "settlement agreement" by Fried, Brown, and Fried's counsel in the briefing and supporting papers[4], the Agreement says nothing about settlement. (*See* Fried Decl. Ex. I.) And there is no evidence in the record of any ongoing, or even anticipated, litigation the parties sought to settle via the Agreement. Although the Court acknowledges MFLP's and Face It's soured relationship preceding the Agreement, the Agreement principally reflects a commercial transaction for the sale and repurchase of stock. Under these facts, the Court cannot find that the Release warrants application of the *Petro-Ventures* exception to *Burgess*. Second, and given the absence of litigation, unlike *Petro-Ventures* and *Facebook*, the Agreement here cannot show that the parties sought "to establish a general peace," *Facebook, Inc.*, 640 F.3d at 1039, the disturbance of which

---

[4] Each repeatedly misrepresents the Agreement to be a "settlement agreement." (ECF No. 47 at 5, 12, 13, 19; Fried Decl. ¶ 30; Brown Decl. ¶¶ 15–17.) These misrepresentations concerning the Agreement are apparently calculated to fit the Agreement into the *Petro-Ventures* exception. The Federal Rules impose a duty on attorneys to ensure that factual representations to the Court, including in motions and supporting papers, "have evidentiary support." Fed. R. Civ. P. 11(b)(3). These representations would appear to fall below this standard.

– 13 –

this Court should avoid.  Although not dispositive, the Court observes that Section 11.1 of the Release expressly permits arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement[.]"  (Fried Decl. Ex. I § 11.1.)  The scope of this provision—limited to claims and controversies relating to the Agreement— and its creation of a dispute resolution procedure for only those types of claims raise doubts for the Court that the parties intended to establish a "general peace" between them by virtue of the Agreement.

Finally, the Court cannot conclude that parties were in "equal bargaining" positions simply because they were represented by counsel.  Melcher and Hell had resigned from Face It's Board nearly a month before finalization of the Agreement— rendering MFLP a "vanilla shareholder" in the words of Fried's counsel.  (ECF No. 47-1 at 20.)  MFLP lacked access to knowledge regarding the Five9 merger discussions.  (JSUF ¶¶ 4–5.)  In contrast, Fried was Face It's CEO and Board Chairman and was negotiating with Five9.  (JSUF ¶ 7.)  These facts cannot show equality of bargaining power generally, let alone the "equality" that courts ascribe to parties locked in the adversarial posture of litigation with access to discovery.  *See Facebook, Inc*., 640 F.3d at 1040 (observing, in upholding litigation settlement release against federal securities claims, that "[t]he [plaintiffs] are sophisticated parties who were locked in a contentious struggle over ownership rights in one of the world's fastest-growing companies.  They engaged in discovery, which gave them access to a good deal of information about their opponents.  They brought half-a-dozen lawyers to the mediation.").  Accordingly, the Court denies Fried's motion for summary judgment on MFLP's federal securities claims based on the Release.

## 2.    The Release Does Not Bar the California State Law Claims

MFLP raises various state law claims against Fried for violations of California securities laws, common law fraud, and breach of fiduciary duty.  (SAC ¶¶ 40–57.)  Melcher raises an elder abuse claim on the ground that Fried, through Face It, acquired Melcher's property, held in MFLP, "for wrongful use and with intent to

defraud." (*Id*. ¶¶ 58–65.)  Fried avers that the Agreement's Release bars these state law claims.  (ECF No. 47-1 at 15–16.)  Plaintiffs oppose summary judgment on the ground that California law would not enforce the Release against their claims.

Pursuant to California law, a release is the "abandonment, relinquishment or giving up of a right or claim to the person against whom it might have been demanded or enforced . . . and its effect is to extinguish the cause of action."  *Pellett v. Sonotone Corp*., 160 P.2d 783, 787 (Cal. 1945); *see also* Cal. Civ. Code § 1541.  "The interpretation of a release is governed by the same principles applicable to any other contract."  *Reudy v. Clear Channel Outdoors, Inc*., 693 F. Supp. 2d 1091, 1113 (N.D. Cal. 2010) (citing *General Motors Corp. v. Superior Court*, 15 Cal. Rptr. 2d 622, 624 (Cal. Ct. App. 1993)).  A court interprets a release to give effect to the parties' mutual intent as it existed when they contracted, as inferred from the release's language.  *See* Cal. Civ. Code §§ 1636, 1638, 1639; *Bank of the W. v. Superior Court*, 833 P.2d 545, 552 (Cal. 1992).

Although the Release's scope would appear broad enough to encompass Plaintiffs' state law claims on its face, (Fried Decl. Ex. I § 6), the Court has doubts about whether the Release unambiguously *applies* to the claims Plaintiffs assert.  "[A]ny contract must be construed as a whole, with the various individual provisions interpreted together so as to give effect to all, if reasonably possible or practicable."  *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 80 Cal. Rptr. 2d 329, 348 (Cal. Ct. App. 1998) (citing Cal. Civ. Code § 1641) (emphasis added).  The Release excepts from its scope "covenants, representations, and agreements by the Parties" contained elsewhere in the Agreement.  (Fried Decl. Ex. I § 6.)  Section 11.1 establishes that "*[a]ny controversy or claim arising out of or relating to this Agreement* or the breach thereof shall be settled" by arbitration.  (*Id.* § 11.1 (emphasis added).)  This provision suggests that the parties did not intend to apply the Release as a bar to claims or controversies relating to the Agreement.  Former Defendant Five9 and Plaintiffs expressly invoked the Agreement's arbitration provision to

arbitrate Plaintiffs' claims as to Five9. (ECF Nos., 7, 8.) Notwithstanding its reservation regarding the Release's application to the state law claims in this case, the Court need not resolve the issue.

Even if the Release applies to the claims, "a written release extinguishes any obligation covered by the release's terms, *provided it has not been obtained by fraud, deception, misrepresentation, duress, or undue influence*." *Skrbina v. Fleming Cos*., 53 Cal. Rptr. 2d 481, 489 (Cal. Ct. App. 1996) (emphasis added). When consent for the procurement of a contract, even one that includes a release, "is induced by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is voidable." *Vill. Northridge Homeowners Ass'n v. State Farm Fire & Cas. Co*., 237 P.3d 598, 602 (Cal. 2010). Thus, a defendant who has fraudulently concealed certain information that it was obligated to reveal to the plaintiff prior to signing an agreement containing a broad release cannot then wield that release against the plaintiff. *See Jefferson v. Dep't of Youth Auth*., 48 P.3d 423, 426–27 (Cal. 2002) (if "contrary extrinsic evidence" shows that the parties did not intend to waive all claims or that fraud, deception, or other "similar abuse" was involved in the transaction, the release is not enforceable); *McClain v. Octagon Plaza, LLC*, 71 Cal. Rptr. 3d 885, 894 (Cal. Ct. App. 2008) ("A party to a contract who has been guilty of fraud in its inducement cannot absolve himself or herself from the effects of his or her fraud by any stipulation in the contract, either that no representations have been made, or that any right that might be grounded upon them is waived. Such a stipulation or waiver will be ignored, and parol[e] evidence of misrepresentations will be admitted, for the reason that fraud renders the whole agreement voidable, *including the waiver provision*." (original emphasis)); *Persson v. Smart Inventions, Inc*., 23 Cal. Rptr. 3d 335, 345 (Cal. Ct. App. 2005) ("[A] party who was fraudulently induced to contract to sell shares cannot be deprived of the well-recognized option to affirm the contract and sue for damages for fraud simply because the contract contained a mutual release of unknown claims."); *Fisher v. Penn. Life Co*., 138 Cal. Rptr. 181 (Cal. Ct. App.

1977).

Plaintiffs' claims concern Fried's alleged fraud in securing the agreement by MFLP to sell back its stock, an agreement finalized in the Agreement. MFLP's claims turn on alleged state securities and common law fraud committed by Fried, and an attendant breach of fiduciary duty. Melcher's elder abuse claim is expressly premised on the acquisition of Melcher's property through the repurchase of MFLP's stock with an "intent to defraud." (SAC ¶ 62); *see also* Cal. Welfare & Institutions Code § 15657 ("elder abuse" occurs when a person "[t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder . . . for a wrongful use or with intent to defraud or both."). Plaintiffs' state law claims therefore fall within the fraud exception to enforceability of a release. The Court acknowledges that courts will enforce a release even when a plaintiff invokes a fraud claim when the defendant owes no duty to the plaintiff necessary to sustain a fraud claim. *See Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1445 (9th Cir. 1986) (enforcing release by noting that "[t]he defendant in *Fisher* owed a fiduciary duty to the plaintiff," but no such duty was owed to the plaintiff). But as the Court will discuss herein, Fried has failed to show the absence of a duty. Whether Plaintiffs can otherwise prove fraud at trial is a separate issue on which Fried has not moved for summary judgment. Accordingly, the Court concludes that the Release cannot bar Plaintiffs' state law claims and denies summary judgment on this basis.

## B.     The Existence of a Duty to Disclose

Fried's second set of summary judgment arguments center on Fried's belief that "[u]nderlying the entire action, and each count, is that there was (supposedly) a duty to disclose the (supposedly) 'ongoing negotiations' between Face It and Five9." (ECF No. 47-1 at 19.)[5] Although Fried commingles his duty arguments, the Court

---

[5] Fried moves for summary judgment on Melcher's elder abuse claim on the ground that if he owed no duty to MFLP, then any property alleged taken from Melcher was not "wrongful." (ECF No. 47 at 24.) Because Fried's duty arguments fail, his summary judgment argument on Melcher's elder abuse claim also fails.

16cv2440

Analyzes first whether there is sufficient evidence that Fried owed a duty to disclose pursuant to federal and state securities law. Second, the Court addresses whether there is sufficient evidence that Fried had a fiduciary duty to MFLP pursuant to state law.

### 1. MFLP's Federal Securities Claims[6]

MFLP asserts claims for violations of Section 10(b) and Rule 10b-5 and Section 20(a) of the Securities Exchange Act of 1934. (SAC ¶¶ 34–39.) The "primary violation" of the federal securities laws in this case concerns Section 10(b) and Rule 10b-5. As Fried recognizes (ECF No 47-1 at 24), MFLP's Section 20(a) claim turns on this alleged violation.[7] The Court limits its duty analysis to Section 10(b).

Section 10(b) establishes in relevant part that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5(b), promulgated pursuant to Section

--------------------------------------------------------

[6] As the Court has noted, MFLP also alleges violations of California state securities law, Cal. Corp. Code §§ 25401, 25402, and 25501. (SAC ¶¶ 40–44.) Section 25401 prohibits misrepresentations in connection with the purchase or sale of securities, Section 25402 forbids insider trading and Section 25501 establishes a private remedy for damages and rescission based on Section 25401 liability. *See Melcher v. Fried*, No. 16-cv-2440-BAS-BGS, 2018 WL 2411747, at *4 (S.D. Cal. May 29, 2018) (citing *Cal. Amplifier, Inc. v. RLI Ins. Co.*, 113 Cal. Rptr. 2d 915, 920–21 (Cal. Ct. App. 2001)). Because these provisions are patterned after federal securities laws, the Court's analysis of MFLP's federal securities claims applies to these claims as well. Accordingly, the Court does not separately analyze MFLP's state law securities claims.

[7] Section 20(a) liability also turns on whether Fried is a "controlling person." 15 U.S.C. § 78t(a). The determination of whether an individual against whom Section 20(a) liability is asserted is a "controlling person" generally "is an intensely factual question, involving scrutiny of their participation in the day-to-day affairs of the corporation and their power to control corporate actions." *Howard*, 228 F.3d at 1065; *G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp., Inc.*, 460 F. Supp. 2d 1246, 1260 (D. Nev. 2006). Fried, however, does not controvert this element of MFLP's Section 20(a) claim either with argument or citation to law or the record. To the extent Fried sought summary judgment on the basis of this element, he has failed to meet his burden to do so.

10(b), makes it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). Rule 10b-5 is a "'catchall' antifraud provision" that encompasses "*any* purchase or sale by *any* person of *any* security" without exception. *SEC v. Clark*, 915 F.2d 439, 448 (9th Cir. 1990) (emphasis in original) (citation omitted). "[A] person violates Rule 10b-5," in relevant part, "by buying or selling securities on the basis of material nonpublic information if (1) he owes a fiduciary or similar duty to the other party to the transaction;" or "(2) he is an insider of the corporation in whose shares he trades, and thus owes a fiduciary duty to the corporation's shareholders[.]" *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc*., 655 F.3d 1039, 1056 (9th Cir. 2011) (quoting *S.E.C. v. Clark*, 915 F.2d 439, 443 (9th Cir. 1990)). The parties dispute whether Fried had a duty necessary for an omission to be actionable pursuant to Section 10(b) and Rule 10b-5.[8]

### a. The Duty to MFLP as a Shareholder

Fried argues that his alleged "silence" regarding the information at issue is not actionable pursuant to Rule 10b-5 because "no fraud-by-omission claim can be made out when there is no legal duty to speak." (ECF No. 47-1 at 20.) Fried's argument is straightforward: if he had no duty to disclose in the first place, then Fried's silence

---

[8] Fried argues for the first time in his reply brief that he had "no intent or motive to withhold information from MFLP" and was financially "harmed" by Face It's repurchase of its stock from MFLP. (ECF No. 53.) To the extent Fried is seeking to controvert the scienter element of MFLP's Section 10(b) and Rule 10b-5 claim through his reply, the Court rejects his attempted ambush by reply. "[A]rguments raised for the first time in a reply brief are improper, and the court need not consider them," principally because "such arguments 'would unfairly deny the non-moving party an opportunity to respond.'" *Derum v. Saks & Co*., 95 F. Supp. 3d 1221, 1229 (S.D. Cal. 2015) (citing *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) and quoting *Rosales v. FitFlop USA, LLC*, 882 F. Supp. 2d 1168, 1176 (S.D. Cal. 2012)). In any event, the Court observes that the "required state of mind" is "scienter," which means "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *In re Silicon Graphics*, 183 F.3d 970, 975 (9th Cir. 1999).

regarding the Five9 merger discussion and the term sheet cannot give rise to Section 10(b) liability.

It is true that "silence in connection with the purchase or sale of securities may operate as a fraud actionable under § 10(b)" only when there is a duty to disclose. *Chiarella v. United States*, 445 U.S. 222, 230 (1980); *see also Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1985) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). Fried's parroting of this *Basic* principle, however, is untethered to any analysis of *when* a duty arises for the purposes of federal securities law or even *whether* the summary judgment record shows a genuine dispute of material fact, or the absence of one, about the existence of a duty. Undertaking its own analysis, the Court concludes that Fried's argument fails on the facts.

As a general matter, federal securities law does not recognize a duty to "a complete stranger" with whom a person trading in securities interacts only through an "impersonal market transaction[]." *See Chiarella*, 445 U.S. at 232–33. But, as MFLP recognizes in opposition (ECF No. 51 at 8, 18), "the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" *Chiarella*, 445 U.S. at 228, 230; *see also Dirks v. S.E.C.*, 463 U.S. 646, 655 (1983) ("[T]here can be no duty to disclose where the person who has traded on inside information 'was not [the corporation's agent], . . . was not a fiduciary, [or] was not a person in whom the sellers [of the securities] had placed their trust and confidence." (quoting *Chiarella*, 445 U.S. at 232) (alterations in original)). Critically, "there is little doubt that the relationship between a corporation and its shareholders engenders the type of trust and confidence necessary to trigger the duty to disclose" material information. *McCormick v. Fund Am. Cos.*, 26 F.3d 869, 876 (9th Cir. 1994); *In re Volkswagen "Clean Diesel" Mktg.*, 328 F. Supp. 3d 963, 984 (N.D. Cal. 2018) (observing that duty to disclose extends to the corporation as well as a "traditional corporate insider," i.e., "someone in senior management or a member of the board of

directors"). Thus, "the corporate issuer in possession of material nonpublic information, must, *like other insiders in the same situation*, disclose that information to its shareholders or refrain from trading with them." *McCormick*, 26 F.3d at 876 (emphasis added).

The undisputed facts show the existence of a relationship that would give rise to a duty to disclose. Specifically, MFLP was a shareholder of Face It until September 12, 2013—the date on which Face It and MFLP's Agreement was signed by their respective agents (Fried and Melcher) and the repurchase closed. (JSUF ¶¶ 1, 6, 8.) The initiation of the merger discussions and Face It's receipt of the draft term sheet occurred *before* all of this. (JSUF ¶ 10.) Although Fried characterizes MFLP as a "non-board member, non-officer, non-employee, simple vanilla shareholder" (ECF No. 47-1 at 20), the fact remains that (1) MFLP *was* a shareholder at the time Fried is alleged to have omitted the information at issue and (2) Fried was "at all relevant times the Chairman of the Board of Directors and [CEO] of Face It." (JSUF ¶¶ 7–8.) These facts support the existence of a duty to MFLP.

Fried raises a few "wild card" arguments untethered to specific claims, but which are nevertheless calculated to buttress his contention that he had no duty to disclose. Fried first argues that "[i]t is hard to understand a fraud-by-omission claim" because he "was told <u>in writing</u> on August 13, 2013 that he was <u>not</u> to contact Melcher, and to just accept the offer." (ECF No. 47-1 at 20 (Defendant's emphasis).) Fried's second argument is that the "terms of the NDA" between Face It and Five9 which he signed on April 11, 2013, "prohibited" him from telling MFLP and Melcher about the merger discussions or the term sheet. (*Id*.) The Court rejects both arguments.

As an initial matter, Fried's representation regarding the August 13, 2013 email is not accurate. The email shows that Melcher's attorney instructed that any communications from Fried regarding the repurchase should go through the attorney. (Brown Decl. ¶ 11 Ex. D; Fried Decl. ¶19.) Fried thus could contact Melcher

indirectly. And, indeed, negotiations between Face It and MFLP regarding the repurchase of MFLP's shares continued for nearly a month with that instruction in place.

Fried's NDA argument is also unavailing. Fried attests that the NDA issued only in the context of a discussion between Face It and Five9 about "possible deals." (Fried Decl. ¶ 26.) The NDA facially concerns only the "Project" for which its confidentiality provisions govern; it does not use the terms "merger" or "acquisition" at all. (Fried Decl. Ex. K § 1.) The NDA also does not facially impose any limitations on how information designated as confidential could be shared internally within Face It, but rather prohibits disclosure only to a "third party," without defining that term. (*Id.*) It is thus unclear whether the NDA prohibited disclosure to a Face It shareholder like MFLP. Although Fried points to the finalized merger term sheet's incorporation of the NDA, he readily concedes that the term sheet was not finalized *until* September 14, 2013—two days after Face It's stock repurchase from MFLP. (Fried Decl. ¶ 30 Ex. L.) Fried sets forth no evidence showing that the NDA's confidentiality provisions applied to the merger talks *before* this date. More fundamentally, neither the email instruction, nor the NDA extinguishes Fried's duty to disclose, which arose based on Face It's relationship with MFLP as a stockholder. This relationship was not extinguished until September 12, 2013, the date on which Face It paid the purchase price for and consequently received all of MFLP's stock.

Fried further argues that there was a "binding and enforceable deal" between MFLP and Face It on August 15, 2013 in the form of an option contract for Face It to repurchase the shares from MFLP. (ECF No. 47-1 at 19–20.) Even assuming an option contract was created[9], the contract cannot negate the duty to disclose that arose

---

[9] The parties dispute whether the email exchange and Melcher's subsequent resignation from the Board created a binding option contract. (*Contrast* Fried Decl. ¶ 22; Brown Decl. ¶ 14 (averring that they "believe" that "a binding commitment was made on August 15, 2013" and "also believe that Carl Melcher similarly thought it was binding" given his resignation from the Board) *with* Melcher Decl. ¶ 10 (MFLP received no consideration for its offer).) The Court need not resolve this dispute given the Court's conclusion that the existence of an option contract does not

based on MFLP's status as a stockholder with which Face It was dealing through Fried.

MFLP's Section 10(b) and Rule 10b-5 claim concerns Fried's failure to disclose material nonpublic information in connection with MFLP's and Face It's repurchase agreement—not the earlier MFLP offer. "[A]n option based on consideration contemplates *two separate [contracts]*, i.e., the option contract itself, which for something of value gives to the optionee the irrevocable right to buy under specified terms and conditions, and the mutually enforceable agreement to buy and sell into which the option ripens after it is exercised." *Steiner v. Thexton*, 226 P.3d 359, 365–66 (Cal. 2010) (quoting *Torlai v. Lee*, 76 Cal. Rptr. 239, 241 (Cal. Ct. App. 1969)) (emphasis added). Fried does not explain how the existence of the option contract precludes the existence of a duty that Face It allegedly failed to discharge in connection with the second contract that is contemplated by an option arrangement. An option is "a unilateral contract under which the *optionee*, for consideration he has given, receives from the optioner *the right and the power to create a contract of purchase during the life of the option*." *Erich v. Granoff*, 167 Cal. Rptr. 538, 542 (Cal. Ct. App. 1980) (emphasis added). In other words, all the purported option contract did was give Face It *the option* to repurchase stock from MFLP at 11.15 cents per share by December 31, 2013. Face It, of course, retained the right *not* to exercise the option. MFLP's contention that Face It, through Fried, should have disclosed allegedly material information to a stockholder before dealing in its stock is entirely consistent with Face It's right to exercise—or not exercise—any option. Accordingly, the Court rejects Fried's summary judgment argument that his alleged omission could not violate Section 10(b) based on the absence of a duty.

### b. Materiality of the Five9 Merger Discussions

Fried also argues that the Five9 merger discussions were too "tentative and

---

preclude the existence of a duty.

preliminary" and thus the information did not need to be disclosed.  (ECF No. 47-1 at 20; ECF No. 53 at 6–7.)  In opposition, MFLP argues that there are triable issues of fact regarding whether the merger discussions and the draft merger term sheet were material.  (ECF No. 51 at 9.)  Specifically, MFLP contends that the fact of merger discussions and the September 5, 2013 draft term sheet with a proposed $12 million price tag for the possible merger "significantly altered the total mix of information that existed" before MFLP and Face It consummated the repurchase.  (ECF No. 51 at 9.)

An omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether to buy or sell securities.  *Basic*, 485 U.S. at 231–32.  "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  *Id.* at 232 (citation omitted).  "The role of the materiality requirement is not to 'attribute to investors a child-like simplicity, an inability to grasp the probabilistic significance of negotiations,' [], but to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision."  *Id.* at 235 (citation omitted).  "Questions of materiality . . . involv[e] assessments peculiarly within the province of the trier of fact."  *SEC v. Talbot*, 530 F.3d 1085, 1097 (9th Cir. 2008) (quoting *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 651 F.2d 615, 619 (9th Cir. 1981)).  In an action brought under Section 10(b) or Rule 10b-5, summary judgment is proper only if the misappropriated information is "'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality,'" or, conversely, not.  *TSC Indus., Inc. v. Northway, Inc*., 426 U.S. 438, 449 (1976) (citation omitted).

Because there is no bright line rule regarding when certain information is material, "[c]ourts look to a variety of factors to determine whether information is

'material' under § 10(b) and Rule 10b-5" even when the information concerns preliminary merger discussions. *See Talbot*, 530 F.3d at 1097. In assessing "the probability that the event will occur, a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels," such as "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries[.]" *Basic*, 485 U.S. at 239. In assessing "the magnitude of the transaction to the issuer of the securities allegedly manipulated, a factfinder will need to consider such facts as the size of the two corporate entities and of the potential premiums over market value." *Id*. Courts have also considered "whether the information comes from an insider or some other source" and "whether information concerning a potential acquisition is '[un]accompanied by specific quantification or otherwise implied certainty.'" *Talbot*, 530 F.3d at 1097–98 (citations omitted).

Based on a totality of the circumstances, there are clearly issues that remain for trial. First, despite Fried's characterization of the merger discussions as "preliminary" at the time of the repurchase, the record shows that the merger occurred within a relatively short time frame. For example, Fried represents that the discussions with Five9 turned toward merger after September 2, 2013. (Fried Decl. ¶ 29.) A draft term sheet was shared by September 5, 2013, finalized on September 14, 2013 with an express statement that the parties "will endeavor to enter into a definitive agreement . . . before October 4, 2013," and the merger closed on October 18, 2013. (*Id*. ¶¶ 30–31, Ex. L; JSUF ¶¶ 10–12.) Viewing these facts in the light most favorable to MFLP, a reasonable juror could interpret them to show a meaningful probability that a merger was likely to occur even at the time MFLP and Face It consummated the repurchase. Second, the record also shows that the upper levels of Face It were directly involved with the Five9 merger negotiations. Fried— Face It's CEO and Chairman of its Board—readily concedes his direct involvement in the Five9 merger negotiations. (Fried Decl. ¶¶ 27–30; JSUF ¶ 7.) Furthermore, MFLP's contention is that Face It, through Fried, repurchased approximately 32% of

its outstanding stock from MFLP for $1.5 million, which "equates to a valuation that is slightly more than $4.8 million." (ECF No. 51 at 9.) The draft term sheet, however, reflects a potential price tag of $12 million in connection. (*Id*.) Both Melcher and his son—MFLP's partners who believed that buyout of MFLP's stock was the only viable option—aver that they would not have sold their shares back to Face It had they known about the merger information. (Melcher Decl. ¶ 12; J.M. Decl. ¶ 13.)

Fried's arguments regarding the materiality of the merger discussions fail for several reasons. First, to the extent Fried's contention is that the Five9 merger talks were immaterial simply because they were preliminary, his argument fails. "Preliminary merger discussions can constitute material nonpublic information for purposes of section 10(b) and Rule 10b-5." *SEC v. Talbot*, 430 F. Supp. 2d 1029, 1039–40 (C.D. Cal. 2006) (citing *Basic*, 485 U.S. at 236), *rev'd on other grounds by Talbot*, 530 F.3d at 1098. Thus, simply stating that the discussions were preliminary does not defeat the possibility that they would have been material.

Second, Fried's narrower argument that there is a "need for at least an agreement on price" for merger discussions to be material is also unavailing. (ECF No. 53 at 6.) Forty years ago, the Supreme Court made clear that: "[w]e . . . find no valid justification for artificially excluding from the definition of materiality information concerning merger discussions, which would otherwise be considered significant to the trading decision of a reasonable investor, merely because agreement-in-principle as to price and structure has not yet been reached by the parties or their representatives." *Basic*, 485 U.S. at 236 (rejecting rule set forth in *Greenfield v. Heublein, Inc*., 742 F.2d 751, 757 (3d Cir. 1984), and instead citing approvingly the "totality of the circumstances" test set forth in *SEC v. Texas Gulf Sulphur Co*., 401 F.2d 833, 838 (2d Cir. 1968) (en banc)). The Court observes initially that Fried's argument is curiously limited only to an alleged lack of agreement about price—not as to the structure. Even if Face It and Five9 did not have an "agreement" on a merger price before Face It and MFLP consummated the

repurchase of MFLP's stock, the absence of such an agreement cannot preclude information about the Five9 merger from being material. *Taylor v. First Union Corp.*, 857 F.2d 240 (4th Cir. 1988), a case on which Fried relies, makes clear that "after *Basic*, this alone is not dispositive of the question of materiality[.]" *Id.* at 244. Although the Fourth Circuit noted that "it is certainly not irrelevant to the totality of the circumstances test articulated in" *Basic*, the Fourth Circuit affirmed that "[t]he materiality of information concerning a proposed merger is directly related to the likelihood the merger will be accomplished; the more tentative the discussions the less useful such information will be to a reasonable investor in reaching a decision." *Id.* at 244–45. Fried makes no persuasive attempt to go beyond his contention that there was no agreement on price to otherwise show why the merger information was not material under the totality of the circumstances.

Finally, case law on which Fried otherwise relies is factually inapposite. For example, Fried relies on *Panfil v. ACC Corp.*, 768 F. Supp. 54 (W.D.N.Y. 1991), a case involving a company which repurchased stock from an investor and whose stock price rose thereafter in light of a possible merger. The district court granted judgment on the pleadings on the plaintiff's Section 10(b) and 20(a) claims for lack of materiality, expressly noting that "[h]ere, there were not 'tentative' discussions, there were *no discussions*." *Id.* at 58 (emphasis in original). *Panfil* is distinguishable because there *were* merger discussions between Face It and Five9 before the consummation of the repurchase. Also distinguishable is *Jackvony v. Riht Financial Corp.*, 873 F.2d 411 (1st Cir. 1989), a Section 10(b) and Rule 10b-5 case involving an alleged failure to disclose merger discussions. As Fried notes (ECF No. 47-1 at 23), the First Circuit affirmed a directed verdict for the defendant company on materiality on the express ground that the evidence "reveals no concrete offers, specific discussions, or anything more than vague expressions of interest." *Jackvony*, 873 F.2d at 415. The First Circuit emphasized the typicality of "possible acquisition that many large companies frequently express," like the defendant company in that

case, which "[a]ny reasonably sophisticated investor in securities buying shares in a large corporation would expect[.]" *Id.* It strains the Court to understand how *Jackvony* bears any resemblance to this case, which involved sustained talks between Face It and Five9 that pre-dated the merger talks, the specific merger discussions Fried concedes occurred with Five9 at least in early September 2013, and the September 5, 2013 draft term sheet. (Fried Decl. ¶¶ 26–30.) Accordingly, the Court concludes that Fried has failed to meet his burden to show that he is entitled to summary judgment on the issue of materiality. Materiality remains an issue for trial.

### 2. Breach of Fiduciary Duty

Fried seeks summary judgment on Plaintiffs' state law claims based on the absence of a fiduciary duty. (ECF No. 47-1 at 20–22). The Court concludes that the Fried has failed to show he is entitled to summary judgment on this claim.

### a. The Issue of Which State's Law to Apply

As an initial matter, the Court notes that the parties have failed to consider the issue of which state's laws apply to this claim, which concerns corporate governance. Fried assumes that California law applies and MFLP unhelpfully relies on case law that is silent on this issue or which applies Washington state law. (ECF No. 47-1 at 20 & n.6; ECF No. 51 at 20 (discussing *Dungan v. Colt Industries, Inc.*, 532 F. Supp. 832 (N.D. Ill. 1982) and *Guarino v. Interactive Objects, Inc.*, 86 P.3d 1175 (Wash. Ct. App. 2004)).

Pursuant to the "internal affairs" doctrine, the general rule is that the law of the state of incorporation of a corporation generally governs the liabilities of directors and officers of a corporation. *See Shaffer v. Heitner*, 433 U.S. 186, 215 n.44 (1977); *see also CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987); *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983). California courts follow the internal affairs doctrine unless the shares of the foreign corporation are not listed or traded on a national exchange, and where more than one-half of the outstanding voting shares are held by California residents. *See* Cal. Corp.

Code § 2115; Cal. Corp. Code § 2116 (directors of foreign corporation transacting intrastate business are liable to corporation for making of unauthorized dividends, purchase of shares or distribution of assets of false certificates, reports or public notices or other violation of official duty according to applicable laws of state of incorporation); *Batchelder v. Kawamoto*, 147 F.3d 915, 920 (9th Cir. 1998); *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1214–15 (N.D. Cal. 2007).

The Agreement signed by Face It and MFLP refers to Face It as a Nevada corporation. (Fried Decl. Ex. I.) This is the only information the Court can discern in the record, including the pleadings, regarding Face It's state of incorporation. At a minimum, this evidence raises the suggestion that Face It was incorporated in Nevada and thus Fried's liability for breach of fiduciary duty in his capacity as Face It's CEO in his dealings with MFLP may be properly assessed pursuant to Nevada, rather than California, law.

This issue of whether Nevada or California law applies, however, makes no practical difference to resolution of Fried's fiduciary duty arguments. Both Nevada and California courts frequently look to Delaware Supreme Court and the Delaware Courts of Chancery as persuasive authorities on questions of corporate governance law. *See Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1245 (D. Nev. 2008) (citing *Shoen v. Amerco*, 885 F. Supp. 1332, 1341 n.20 (D. Nev. 1994)); *Oakland Raiders v. NFL*, 113 Cal. Rptr. 2d 255, 266 n.5 (Cal. Ct. App. 2001) ("The parties agree that we may properly rely on corporate law developed in the State of Delaware given that it is identical to California corporate law for all practical purposes." (citing *Shields v. Singleton*, 19 Cal. Rptr. 2d 459 (Cal. Ct. App. 1993))). Fried in turn invokes Delaware state authorities to argue that there was no fiduciary duty he could have breached. (ECF No. 47-1 at 20–22.) Reviewing Fried's Delaware law-based arguments, the Court concludes he has failed to show that no fiduciary duty existed.

### b. Fried's Delaware Law Arguments Fail

Fried's first argument ineptly seeks to establish a "Catch-22" for MFLP's breach of fiduciary duty claim. His opening brief repeatedly asserts that "the repurchase was by the company (not Fried)" and then avers that "the company does not owe a fiduciary duty to its shareholders." (ECF No. 47-1 at 20–22.) In effect, Fried argues that (1) on the one hand, he could not have breached a fiduciary duty because he did not purchase the shares himself and (2) on the other, Face It, which did repurchase the shares, does not have a fiduciary duty and (3) thus MFLP cannot assert any a claim for breach of fiduciary duty.

The very authority on which Fried relies for this argument makes clear in whom a fiduciary duty resides: "a corporation does not owe fiduciary duties to its stockholders, *the board of directors and officers do*." *In re Nine Sys. Corp. S'holders Litig.*, No. 3940-VCN, 2014 WL 4383127, at *57 (Del. Ch. Ct. Sept. 4, 2014) (emphasis added). The *In re Nine* court expressly observed that "the Defendants who *acted as agents of the Company* in facilitating the stock repurchase, *even if they did not purchase the stock*, could still have liability because they were responsible for the Company's statements and omissions[.]" *Id.*; *see also In re Wayport, Inc. Litig.*, 76 A.3d 296, 319–20 (Del. 2013). It is undisputed that Fried acted as the CEO and Chairman of Face It's Board. (JSUF ¶ 7.) And Fried expressly declares that "during the times in question I was the [CEO] at Face It, *acting at the direction of Face It's board*." (Fried Decl. ¶ 2 (emphasis added).) The notion that Fried could not have breached a fiduciary duty to MFLP because he did not purchase MFLP's stock thus fails on its face.

Fried's second argument against the existence of a duty to disclose turns on application of the "special facts" doctrine. (ECF No. 47-1 at 21–22.) Relying on *In re Nine* for this argument as well, Fried suggests that the merger discussions between Face It and Five9 were too preliminary to satisfy the "special facts" doctrine. (*Id.*) Fried in turn relies on *In re Wayport* to argue that he had no greater duty to speak

than a fiduciary would have.  (*Id.* at 22.)

Pursuant to Delaware law, directors of a corporation owe the fiduciary duties of care and loyalty from which a duty to disclose derives.  *In re Wayport, Inc. Litig.*, 76 A.3d at 314.  Under the "special facts" doctrine adopted by the Delaware Supreme Court in *Lank v. Steiner*, 224 A.2d 242 (Del. 1966), a director has a fiduciary duty to disclose information in the context of a private stock sale "only when a director is possessed of special knowledge of future plans or secret resources and deliberately misleads a stockholder who is ignorant of them."  *Id.* at 244; *In re Wayport, Inc. Litig.*, 76 A.3d at 315.  "Special circumstances" that trigger a duty of disclosure in a corporate director or officer "include peculiar knowledge of directors as to important transactions, prospective mergers, probable sales of the entire assets or business, agreements with third parties to buy large blocks of stock at a high price and impending declarations of unusual dividends."  *In re Wayport, Inc. Litig.*, 76 A.3d at 317 (citation omitted).  "The threshold for a 'special fact' is higher than that for information to be deemed material" and "[i]information about a possible merger or similar transaction generally becomes material when there is an 'agree[ment] on the price and structure of the transaction."  *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *57 (citing *In re Wayport, Inc. Litig.*, 76 A.3d at 321; *Bershad v. Curtiss–Wright Corp.*, 535 A.2d 840, 847 (Del. 1987), *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

Pursuant to the "special facts" doctrine, a fiduciary is "free to purchase shares from . . . stockholders, without any fiduciary duty to disclose information about the Company or its prospects, unless the information relate[s] to an event of sufficient magnitude to constitute a 'special fact.'"  *In re Wayport, Inc. Litig.*, 76 A.3d at 320.  If the fiduciary knows of a "special fact," then it "had a duty to speak and could be liable if [it] deliberately misled the plaintiff[] by remaining silent."  *Id.*  "To satisfy the 'special facts' requirement, a plaintiff generally must point to knowledge of a substantial transaction, such as an offer for the whole company."  *Id.*

Despite invoking the "special facts" doctrine, Fried's particular argument is that MFLP fails to satisfy the materiality threshold that is a necessary predicate for information to rise to the level of a "special fact." The Court rejects Fried's argument. The *In re Nine* court reasoned that the plaintiffs could not satisfy the lower materiality standard because "[t]here are no contemporaneous term sheets, letters of intent, or draft agreements in the record. Any conversations with potential acquirers at that time could hardly be called negotiations." *In re Nine Sys. Corp. S'holders Litig*., 2014 WL 4383127, at *58. Although Fried points to *In re Nine*, the record in this case shows that merger negotiations between Face It and Five9 were occurring before consummation of the repurchase and there was a draft term sheet a week before the repurchase Agreement was signed and Face It made its payment. The signing of finalized term sheet with a price term occurred a mere two days after the repurchase. A reasonable jury could view these facts as satisfying the predicate standard of materiality for the information to constitute a special fact. Beyond the materiality threshold, the record also shows that MFLP had previously expressed directly to Fried an interest in Face It undertaking a merger. Accordingly, the Court rejects Fried's summary judgment challenge to MFLP's breach of fiduciary claim.

## C.    Rescission Claim

As a final matter, MFLP raises a seventh cause of action for "rescission" of the Agreement on the grounds that (1) Fried fraudulently procured the agreement by failing to disclose the merger negotiations between Face It and Five9 and (2) Fried breached his fiduciary duty to MFLP by failing to disclose such material information. (SAC ¶¶ 66–69.) Relying on California state authorities and a misinterpretation of MFLP's rescission claim as limited to partial rescission of only the Release, Fried argues that "rescission cannot be had" because, for example, (1) the parties cannot be restored to their original positions, (2) any rescission request is untimely, and (3) MFLP purportedly waived the right to seek rescission based on its steps to affirm the Repurchase Agreement. (ECF No. 47-1 at 15–19.) All of these state law arguments

are inapposite because a party may assert a rescission claim pursuant to federal securities law.[10]

Section 29(b) of Securities Exchange Act of 1934 provides that "[e]very contract made in violation of any provision of [the securities laws] or of any rule or regulation thereunder, and every contract . . . the performance of which involves [such a] violation . . . shall be void (1) as regards the rights of any person who, in violation of any provision, rule, or regulation, shall have made or engaged in the performance of any such contract[.]"  15 U.S.C. § 78cc(b).  The Supreme Court has interpreted Section 29(b) "as rendering the contract merely voidable *at the option of the innocent party*." *Mills v. Elec. Auto-Lite Co*., 396 U.S. 375, 387 (1970) (emphasis added); *see also Facebook, Inc*., 640 F.3d at 1039 ("If Facebook violated Rule 10b-5, the [plaintiffs] would be entitled to rescission of the Settlement Agreement.").  The innocent party to a contract which violates federal securities law thus has "the right to rescind," and, in the absence of the exercise of such right, courts will not "regard the contract as void where he has not invoked that right" so as to avoid "the possibility of hardships to him or others[.]"  *Mills*, 396 U.S. at 388.

"In order to void [an] Agreement under Section 29(b), [an individual] must establish that: (1) the contract involved a prohibited transaction; (2) he is in contractual privity with [the entity]; and (3) [the individual] is in the class of persons that the securities acts were designed to protect."  *In re Wells Fargo & Co. S'holder Derivative Litig*., 282 F. Supp. 3d 1074, 1105 (N.D. Cal. 2017); *see also In re MRV Commc'ns Derivative Litig*., No. CV-08-03800-GAF-RCx, 2010 WL 5313442, at *11 (C.D. Cal. Dec. 27, 2010) (quoting *Berckeley Inv. Group Ltd. v. Colkitt*, 455 F.3d

---

[10] Furthermore, the Court's motion to dismiss order observed that California law does not recognize rescission as a claim, but rather treats it as a remedy for state law claims.  *Melcher v. Fried*, No. 16-cv-2440-BAS-BGS, 2018 WL 2411747, at *6 (S.D. Cal. May 29, 2018) (citing *Reyes v. Wells Fargo Bank, N.A*., No. C-10-01667 JCS, 2011 WL 30759, at *17 (N.D. Cal. Jan. 3, 2011) (agreeing that in California "there is no standalone claim for . . . rescission") and *Nakash v. Superior Court*, 196 Cal. App. 3d 59, 70 (Cal. Ct. App. 1987) ("Rescission is not a cause of action; it is a remedy.")).

195, 205 (3d Cir. 2006)).

The second and third elements are satisfied here. MFLP was in privity with Face It by virtue of the Repurchase Agreement at the heart of MFLP's rescission claim. (Fried Decl. ¶ 24 Ex. I.) As the seller of the securities underlying the instant action, MFLP is clearly within the class of persons that the securities laws were designed to protect. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739–41 (1975) ([T]he plaintiff class for purposes of a private damage action under § 10(b) and rule 10b-5 [is] limited to actual purchasers and sellers of securities."). Whether the Agreement involved a prohibited transaction turns on whether MFLP is able to prove its Section 10(b) and Rule 10b-5 claim at trial, for which triable issues remain. Accordingly, triable issues also remain as to the first element of a Section 29(b) rescission claim and the Court denies summary judgment on rescission.

## CONCLUSION & ORDER

For the foregoing reasons, the Court **DENIES** Defendant Lance Fried's motion for summary judgment in its entirety. (ECF No. 47.)

**IT IS SO ORDERED.**

**DATED: December 4, 2018**

Hon. Cynthia Bashant
United States District Judge